IN THE MATTER OF THE ALLEGED NULLITY OF "AN ACT CONCERNING ALCOHOLIC BEVERAGES, AND SUPPLEMENTING CHAPTER ONE OF TITLE 33 OF THE REVISED STATUTES," COMMONLY KNOWN AS CHAPTER 264 OF THE LAWS OF 1942 OF THE STATE OF NEW JERSEY.

Argued January 19, 1943—Decided April 30, 1943.

124

Before BROGAN, CHIEF JUSTICE, and Justices PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER and COLIE.

For the petitioners, *Osborne, Cornish & Scheck* (*Ervin S. Fulop*, of counsel).

For the respondent Neil Deighan, *George H. Stanger*.

For the respondents William G. Wellhofer et al., *William C. Egan*.

The opinion of the court was delivered by

PERSKIE, J. · Pursuant to *N. J. S. A.* 1:7-4, petitioners, on November 8th, 1942, attacked the enactment of *Pamph. L.* 1942, *ch.* 264, *p.* 708, approved June 25th, 1942 ("An act concerning alcoholic beverages, and supplementing Chapter one of Title 33, of the Revised Statutes"). That attack is based upon the broad statutory grounds that petitioners had "reason to believe" that L. 1942, *supra,* was "not approved by the Governor" or "otherwise made effective as law in the manner required by the constitution * * *." *N. J. S. A.* 1:7-1.

The statute thus invoked concededly permits an attack only upon the "procedure," the "machinery" of making laws and not upon the constitutional validity of their "provisions." For the statute relates "exclusively" to the matter of "passage

and enactment and not to the effect of the statute when so enacted." *In re Borg,* 123 *N. J. L.* 104, 105, 106; 8 *Atl. Rep.* (*2d*) 221. The case at bar was so argued and briefed and is considered and determined accordingly.

And since the legislature has permitted such attack to be made upon its enactments, "which [enactments] but for such permission would be unexpungable" (*Cf. Pangborn* v. *Young,* 32 *N. J. L.* 29), petitioners must establish the truth of what they assert by "clear and convincing evidence." *In re Low,* 88 *Id.* 28, 30; 95 *Atl. Rep.* 616. *Cf. In re Petition of Attorney-General,* 98 *N. J. L.* 586; 121 *Atl. Rep.* 736.

The question we are therefore called upon to decide is whether petitioners have properly established as charged that the president of the Senate in approving Senate Bill No. 296, now L. 1942, *supra,* acted in excess of the power conferred by article V, paragraph 13 of the State Constitution which, so far as is here pertinent, provides:

"In case * * * of the governor(s) * * * absence from the state * * * the powers, duties, of the office shall devolve upon the president of the senate * * * until the governor, absent * * * shall return * * *."

The evidence which gives rise to the stated question is as follows: Hon. Charles Edison, Governor of the state, in planning to attend, as he did, a conference of governors at Ashville, North Carolina, "made arrangements" with Mr. I. Grant Scott, president of the Senate, "to act in his [Governor's] absence from the state." In pursuance of those arrangements, and before assuming the duties of acting governor, Senator Scott, on June 20th, 1942, took the statutory oaths of office. *N. J. S. A.* 52:15-4 and *N. J. S. A.* 41:1-1, *et seq.* Thereafter, and for a "little over two weeks" "until some time in July" (the exact date is not made to appear) Senator Scott, without challenge or protest on the part of anyone, openly exercised the powers, duties and functions of the office of the governor. He was recognized by members of Governor Edison's staff and by the people as the acting Governor of the state. During the stated period, he approved some seventeen bills which, according to the records of the Secretary of State, are now the following numbered chapters

of the public law (1942) of the state: approved on June 25th, 1942, chapter 264 (act concerning alcoholic beverages, here in question), approved June 29th, 1942, chapter 265 (act appropriating $10,000 to the Commission on Historic Sites), chapter 266 (act appropriating $10,000 to the Commission on Historic Sites), and chapter 267 (act providing for no lapsing of unexpended balance of appropriations made), approved June 30th, 1942, chapter 268 (act amending section 39:3-84 of the Revised Statutes), chapter 269 (act amending section 18:13-9, service determining seniority right of teachers), chapter 270 (act making appropriation to the Commission on Interstate Co-operation), chapter 271 (act amending act authorizing cities to sell certain lands), chapter 272 (act concerning State Highway Department), chapter 273 (act transferring $100,000 to State Purchase Fund), chapter 274 (Supplement to Title 12, chapter 5 of Revised Statutes), chapter 275 (act providing payment of temporary bonus to certain state employees), chapter 276 (act appropriating $10,000 to the legislature), chapter 277 (act appropriating $15,000 to Department of Alcoholic Control), chapter 278 (act authorizing State House Commission to sell land in Kearny to a Post of the Veterans of Foreign Wars), chapter 279 (act concerning sale of Revised Statutes, and chapter 280 (amending act concerning payment of temporary bonus, *supra*).

Senate Bill No. 296, in the 1942 session of the legislature, "passed" the Senate and Assembly on June 15th, 1942, was "forwarded" to the Governor's office on June 25th, 1942, and was "approved" by the acting Governor, about 11:30 A. M., on June 25th, 1942, in the office of the Governor at Trenton, New Jersey, in the presence of an executive assistant to Governor Edison, a fellow senator who sponsored the bill, the president of the association of retail dealers of alcoholic beverages, and a photographer. The bill was then filed with the Secretary of State, *N. J. S. A.* 1:2-5, and is now L. 1942, *supra*. Although comment is made upon the speed with which the bill was singled out and approved without investigation, nonetheless, counsel for petitioners emphasize that they charge "no one with improper conduct."

Governor Edison re-entered the state about 8:30 A. M., on June 25th, 1942; his train arrived at Newark approximately 9:15 A. M. He talked with Senator Scott, over the telephone, "within a half hour, three-quarters of an hour previous to the signing of the bill." At the time of this conversation Senator Scott was in the Governor's office at Trenton. The evidence does not disclose the place from which Governor Edison spoke, nor the subject-matter of that conversation. Nor is there any evidence that the Governor told Senator Scott that he (Governor Edison) had returned to assume his executive powers and duties. Nor is there any evidence that the Governor caused notice of such a return to be given to the personnel of his staff who concededly recognized Senator Scott as the acting Governor at the time he approved Senate Bill No. 296. As already indicated, the personnel of Governor Edison's staff continued so to recognize Senator Scott until the early part of July, 1942, when the Governor returned from another absence from the state, which absence began about 2:00 P. M., on June 28th, 1942, and caused notice of his return to assume his executive powers to be given to Senator Scott who thereupon ceased to function as the acting Governor. We mark the facts that arrangements, *de novo,* were not made by or for the Governor with Senator Scott to function as acting Governor from June 28th, 1942, to the early part of July, 1942, and that Senator Scott did not again take the statutory oaths of office so to function.

The evidence of the Governor is, however, that he "resumed the duties of his office between June 25th and June 28th, 1942," and that he "considered [himself] available for all the duties the Governor was supposed to perform during that time." We attach no particular significance to his admission that he could not recall from memory just where he was on each day from June 25th to June 28th, 1942, or to specify what particular duties, if any, he may have performed on each of those days. For although the Governor made abundantly clear that he could "easily" have caused a check up to be made of the "very complete record" which he kept "of his activities," yet, for reasons not disclosed, counsel for neither side took advantage of his offer. Be that as it may,

the question still remains whether the Governor had made a "return" to the state within the meaning of that word as used in the constitution.

For petitioners it is contended that, in the circumstances exhibited, the presence of the Governor in the state on June 25th, 1942, before Senate Bill No. 296 was approved by Senator Scott, as acting Governor, *ipso facto,* constituted a "return" by the Governor to the state within the meaning of the constitution (article V, paragraph 13), and thus in the legal sense rendered Senator Scott powerless to approve the bill, and requires us to decree L. 1942, *supra,* null and void.

We think that petitioners' contentions are not sound. They are based, in our opinion, upon a too narrow and strict, if not an altogether erroneous, interpretation of the provisions of article V, paragraph 13, of the constitution.

There is no need to restate the established principles of law controlling the interpretation of a constitutional provision. They are fully stated in *State* v. *Murzda (Court of Errors and Appeals),* 116 *N. J. L.* 219, 222, 223; 183 *Atl. Rep.* 205. It shall suffice if we but observe that ours is the function to ascertain the "true sense and meaning" of the words used in light of the provision in which they appear, and in light of the correlated provisions, if any, and in light of the instrument as a whole. More tersely stated, our objective is to ascertain the "thought" which the constitution expresses. *State* v. *Murzda, supra* (at *pp.* 222, 223). In thus seeking to give effect to the intent of the framers of the constitution and of the people who accepted it, we presume that "words have been employed [save terms of art] in their natural and ordinary meaning." In the classic words of Chief Justice Marshall, the framers of the constitution and the people adopting it "must be understood to have employed words in their natural sense, and to have intended what they have said." 1 *Cooley's Constitutional Limitations* (*8th ed.*) *ch. IV, p.* 97, *p.* 130.

With these principles in mind let us briefly consider the correlated provisions under article V of the constitution. In dividing the powers of the government, the framers of

the constitution and the people who adopted it, vested the executive powers in a governor. Article V. In so doing, they provided, among other things, that the Governor "shall take care that the laws be faithfully executed." Article V, paragraph 6. And to the end that the people should never be without a governor, or another in his place to exercise the executive powers and duties of their government, they very carefully provided upon whom those powers and duties should devolve in case of the death, resignation or removal from office of the Governor (article V, paragraph 12), in case of the impeachment of the Governor, his absence from the state, or inability to discharge the duties of his office (article V, paragraph 13), and in the case of a vacancy from any other causes (article V, paragraph 14). Obviously, these provisions cannot be made effective unless the circumstances under which they are invoked are made known to those affected, the people, and to whoever, under the circumstances, is to act as governor.

In light of these observations, we recur to the specific constitutional provisions in issue, article V, paragraph 13. The key words of that provision are "absence" and "return." Their meaning as used in the stated provision has not heretofore received our consideration and determination. The verb "return" is variously defined. A "return implies the prior existence of some state or condition." (*Clyatt* v. *United States,* 197 *U. S.* 207, 219; 49 *L. Ed.* 726, 730); it "implies going back to a former location, to the prior existence of some state or condition." 54 *C. J.* 741, § 2; "to go or come back again to a place, a person, or condition." Webster's New International Dictionary. Thus there can be a "return" to a place, to a former status, or to both. And under these definitions it obviously becomes necessary to search and find the true meaning of the word "absence" or "absent" as used in the constitutional provision before us. For only by understanding the meaning of the words as used in context can we determine whether the Governor's physical return to the state, *ipso facto,* divested Senator Scott of his authority to approve the statute under review (Senate Bill No. 296).

To say that the word "absence" or "absent" from the state

means "non-presence" in it (*Cf. Manner* v. *Ribsam*, 61 *N. J. L.* 207; 41 *Atl. Rep.* 676; *Engeman* v. *State*, 54 *N. J. L.* 247, 251; 23 *Atl. Rep.* 676), does not answer the question in issue. For what purpose and for how long must the Governor be not present in the state before he can be said to be absent therefrom? The authorities which have considered these questions are not in accord. One view holds that such words comprehend an "absence" from the state by the Governor for any purpose or for any period of time however short. Typical cases in support of that view are *Re Crump*, 10 *Okla. Ct. Rep.* 133; 135 *Pac. Rep.* 428; 47 *L. R. A.* (*N. S.*) 1036; *Montgomery* v. *Cleveland*, 134 *Miss.* 132; 32 *L. R. A.* 1151; *Walls* v. *Hall*, 154 *S. W.* (2d) 573; 136 *A. L. R.* 1047. Another view holds that such words mean an "absence" such as will "injuriously affect the public interest" and does not include "a mere temporary absence." Typical adjudications in support of that view are *State, ex rel. Warmoth* v. *Graham*, 26 *La. Ann.* 568; 21 *Am. Rep.* 551, and cases collated in *Montgomery* v. *Cleveland, supra* (at *p.* 1154 of 32 *A. L. R.*). For a summary of both views, see 12 *R. C. L.* (*Governor*), *pp.* 1011, 1012, § 12; 24 *Am. Jur., Governor, p.* 828, § 9.

Under the first view, notwithstanding modern facilities of communication and transportation, the Governor would be absent from the state if he were but to leave it long enough to go to New York or Philadelphia for part of a day or evening to attend a public or private function.

It is not reasonable to adopt so narrow and strict construction or interpretation of the word "absence." We think that the other view which is made to depend upon the particular facts and circumstances of each "absence" from the state by the Governor comprehends the common sense idea of the word "absence" as used in the constitution. We adopt it and with that concept in mind turn to the interpretation of the word "return."

While it is undoubtedly true that the Governor retains his status and serves the people wherever he may be in the state, it is equally true that the right of the people never to be without a Governor or another legally exercising his power and performing his duties, is a fundamental right. It becomes a

meaningful right only when the people know that the Governor is in the state and exercising the powers and performing the duties of his office. While there is of course no provision in the constitution or otherwise that a public record be made when the Governor "absents" himself from the state and when he "returns" thereto to assume his powers and duties, nevertheless, orderly procedure and freedom of confusion in the administration of state affairs require notification to the acting Governor—and through him to the people—of the Governor's "absence" from and "return" to the state so that the beginning and end of the acting Governor's right to exercise the executive powers and duties should be made public. Implicit, therefore, in the arrangements for the president of the Senate to exercise the executive powers and duties of the Governor during the latter's absence is the correlative duty of the Governor to give notice to the acting Governor that he has returned to assume his duties. We, therefore, hold that the word "return," in the circumstances, contemplates that the Governor comes back to the state and advises his pro temporary successor that he is ready to resume his executive powers and duties. This very practice was employed when the Governor returned in July of 1942 from his absence from the state which began on June 28th, 1942, and to us it seems the sensible practice.

We do not share the suggested view that Senator Scott, because his oath as president of the Senate was all-inclusive, was not obliged to have taken the statutory oaths of office before assuming his duties as acting Governor. The propriety of such statutory requirements is not attacked. It is indeed beyond attack at this late day. Whatever may be the law elsewhere (see *Walls* v. *Hall, supra,* at *pp.* 1151, 1152 of 136 *A. L. R.*), we have had such statutory requirements for many years. *Pamph. L.* 1898, *ch.* 2, *p.* 12, now *N. J. S. A.* 52:15-4. See, also, *N. J. S. A.* 41:1-1, *et seq.* In fact, we know of no official—constitutional or otherwise—who is not obliged to take the statutory oaths of office before he may lawfully assume his duties. Nor do we share the suggested view that we are not concerned with the consequences if we were to give the word "return" the narrow definition urged,

however confusing and damaging the consequences may be. It is our concern. We are obliged to give this word its intended and meaningful significance. Especially is that so when, as here, there is nothing to indicate that a contrary use was intended. *Cf. Cooley's op. cit., supra, p.* 153.

If the word "return" were used to express the thought that an unannounced physical "return" to the state by the Governor stripped the acting Governor of his right temporarily to exercise the executive powers and duties of the office, strange and serious results would follow. For instance, the moment the conveyance on which the Governor is traveling passed over the state line on his "return" journey, the right of the acting Governor to exercise the powers and duties of the Governor would cease although neither he nor the public would have any knowledge of the Governor's return to or presence in the state. Or, let us suppose that the Governor on his journey to Ashville found after he was out of the state that he had to return to his home for a brief minute and then resumed his journey. Here again the right of the acting Governor to exercise the powers and duties of the Governor would cease although neither he nor the public had knowledge of the Governor's "return" to or presence in the state.

No such meaning of the word "return" was contemplated. Nor is it reasonable. Such a construction or interpretation thereof would cast great doubt and uncertainty upon the constitutional validity of the "procedure," the "mechanics," employed in enacting public laws. The word "return" was not intended to be so construed.

We have considered all other matters argued and find them to be without merit.

The petition is dismissed, with costs.

Mr. Justice Colie did not participate in the determination of this case.

Mr. Justice Parker and Mr. Justice Case dissent.

CASE, J. (Dissenting.) The pertinent provision of the constitution is that "in case of the * * * absence [of the governor] from the state * * * the powers, duties and emoluments of the office shall devolve upon the president of

the Senate  *  *  *  until the governor absent  *  *  *
shall return  *  *  *." Those are simple and ordinary words.
Their meaning is plain; and their meaning to-day is the
same as the day they were written. Given their natural sig-
nificance they make sound sense and are capable of practical
operation.

There is an "absence [of the governor] from the state"
when the Governor is absent *from the state*. It is clear
beyond peradventure that the word "state" is there used
geographically. Clearly, too, the words "shall return" are
used in antithesis to the words "absence from the state."
The return of the Governor, unless we are to strain simple
words beyond their usual meaning, refers to the return of
the Governor *to the state* after his absence *from the state*.
The paragraph is complete within itself. We have no occasion
to search the context as an aid to interpretation; and if,
notwithstanding, we do search the context we find nothing
to vary the manifest significance of the language. Constitu-
tional provisions are imperative when they are clear. It is
only when they are not clear that resort may be had to con-
struction; particularly if by construction is meant the adding
of something that is not there.

Regard the salient facts: Before the bill was signed by
the Senate president as acting Governor the Governor himself
had come back to the state and had called his office in the
state house by telephone and talked with the Senate presi-
dent. The Senate president did not at the time know that
the Governor was in the state. It was his understanding that
the latter had telephoned from New York City. Further,
the Governor's staff at the state house raised no objection,
apparently, to the exercise of executive functions by the Senate
president. But the fact was that the Governor was then, and
was continuously for some days thereafter, in the state, con-
sidering himself, as he testified, available for all the duties
that the Governor was supposed to perform during that time,
and entertaining the view, as he further testified, that, accord-
ing to the constitution, when the Governor was in the state
the duties of the acting Governor came to an end. The return
of the Governor was not surreptitious. It was not concealed.

It had not the fleeting aspect of one in transit. It was fully and fairly a return to the state in the usual and natural use of the word "return." Only by injecting some extraordinary and technical meaning may it be said otherwise. It is also to be noted that the only legislative bill signed by the Senate president, as acting Governor, during the disputed period, is the one now before us as chapter 264 of the Pamphlet Laws of 1942.

If the Senate president was entitled to exercise the functions of the chief executive throughout the period from June 25th to June 28th, inclusive, upon the assumption that he had not been notified by the Governor of the latter's return, it must follow that during that period the Governor had no authority to act as such; for there cannot be two Governors at the same time, and if the Senate president had the executive authority the Governor did not have it. Consequently, any official act, if there was such, performed by our Governor during that period was invalid. That is contrary to my view of the constitution. I express no view as to the wisdom or unwisdom of making it a condition upon the Governor that he shall not exercise the functions of his office after his return from an absence unless he shall first give notice to the Senate president that he has returned; but I suggest that that condition is not in the constitution, either expressly or by implication, and that if it is to be added it should be done by those who have the right to make changes therein and not by the court.

Further, bearing in mind the conception of the majority that the presence of a Governor in New York City does not necessarily imply an absence from this state in the constitutional sense, did it not, upon that reasoning, become the duty of the Senate president, when he received the impression that the Governor was in New York City, to make inquiry as to the nature and extent of the stop in that place? Was he not, in effect, on notice?

The question is one of constitutional authority. I consider that no one—not any one of the Governor's official staff and not the Governor himself—could, by act or omission, confer upon, or continue, the authority of the Senate president to

perform the duties and exercise the powers of the Governor after the Governor had come back to the state and while he was in the state and under no disability.

The alleged statute should, in my opinion, be declared null and void.

I am authorized by Mr. Justice Parker to say that he joins in the foregoing views.