58 N.J. Super. 1 (1959)
155 A.2d 289
IN THE MATTER OF THE APPLICATION OF EDWARD R. McGLYNN, ROBERT E. KROUSE AND BENJAMIN C. LONDA, APPLICANTS, FOR AN ORDER OF ADJUDICATION, ETC. RE: CHAPTER 46, LAWS OF 1959, ETC., PURSUANT TO CHAPTER 7 OF TITLE 1 OF REVISED STATUTES.
Superior Court of New Jersey, Appellate Division.
Argued July 1, 1959.
Decided July 1, 1959.
*6 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Walter H. Jones argued the motion for the Senate of New Jersey.
Mr. Elmer M. Matthews argued the motion for the General Assembly of New Jersey, and for himself individually.
Mr. Frederick J. Gassert argued the motion for New Jersey Association of Private Colleges and Universities, and for himself individually (Messrs. Gassert, Murphy & Gassert, attorneys; Mr. Thomas H. Gassert, of counsel).
Mr. Joseph M. Nolan argued on behalf of applicants in opposition to motions to dismiss (Mr. Martin C. Conant, on the brief).
Mr. Wesley L. Lance, appeared amicus curiae.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The applicants, three citizens of the State of New Jersey, have applied to the Appellate Division, pursuant to N.J.S.A. 1:7-4, for an adjudication that the statute now known and designated as chapter 46 of the Laws of 1959 was not made effective as law in the manner provided by the Constitution, and is therefore void.
On June 3, 1959 notice was served on the Attorney General that the application would be presented to this court and an order sought defining and determining the procedure to be followed. The matter was set down for June 15, at which time the applicants were directed to give public notice, by publication in eight designated newspapers throughout the State, that any citizen might appear in defense of the purported law, and subpoena and examine and cross-examine witnesses. See N.J.S.A. 1:7-2 and 5. Notice of intention *7 to do so was to be filed on or before June 26. The notice was duly published, but no citizen responded.
On June 15 the following were, on application, permitted to intervene in defense of the purported law: Walter H. Jones, on behalf of the Senate of New Jersey; Elmer M. Matthews, on behalf of the General Assembly of New Jersey, and for himself individually; and Frederick J. Gassert, on behalf of the New Jersey Association of Private Colleges and Universities, and for himself individually. Senate President Wesley L. Lance was permitted to appear as amicus curiae, as was the Attorney General of New Jersey. A full hearing of the matter was set down for July 1, at which time the court would inquire summarily into the circumstances to determine whether the constitutional and statutory provisions relating to the enactment and approval of laws had been complied with. See N.J.S.A. 1:7-2 and 3.
In the meantime, each of the three intervenors moved to dismiss the application for failure to state a cause of action upon which the relief sought could be granted, claiming that the admissible factual allegations of the application failed to establish that chapter 46 was not enacted in a valid manner, but on the contrary showed that it had been duly passed by both Houses of the Legislature and made effective as law in the manner required by the Constitution. The motions were argued June 22, 1959, at which time we determined that they be held until the scheduled hearing of July 1 had been concluded and the record closed. Counsel were instructed that the court particularly desired further information "regarding the factual basis for the final certification to Senate Bill No. 2 (which became Chapter 46) by the Speaker of the House of Assembly, and also as to whether the Senate, in sending that bill to the General Assembly, failed to accompany it with the objections of the Governor."
The matter was fully heard, argued and decided on July 1. This opinion amplifies the oral conclusions we made at that time, resulting in a dismissal of the application.

*8 I.
The argument advanced by the applicants, summarized in II below, makes necessary a brief review of the legislative history of Senate Bill No. 2 as well as two other bills, Senate 259 and Senate 264, intended as amendments of Senate 2.
Senate 2 was introduced January 13, 1959. The title of the bill was:
"An Act concerning higher education, providing for the creation, award and administration of State competitive scholarships for use by qualified students in any accredited New Jersey institution of collegiate grade, and repealing section 18:16-33 of the Revised Statutes."
It passed on third reading on January 19, 1959 by a vote of 20-0, and on the same day was sent to the House of Assembly, where it was finally passed on May 4, 1959 by a vote of 39-3. The bill then went to the Governor, who returned it to the Senate on May 11, 1959 for reconsideration, with his objections, pursuant to Art. V, Sec. I, par. 14(b) of the State Constitution.
Senate 2, to be known as the State Competitive Scholarship Act, established a general college scholarship program to be administered by a newly created State Scholarship Committee consisting of the Commissioner of Education and eight other members to be appointed by the Governor. Scholarships would be $400 or the amount charged for tuition, whichever was less. The grants would be based mainly on financial need and the result of a single competitive examination. The number of scholarships to be awarded annually was to equal 5% of the total number of students graduating from approved New Jersey high schools during the school year preceding the examination. Each scholarship was to be for a period of four academic years, conditioned upon the holder achieving satisfactory academic progress and being regularly enrolled in an institution of collegiate *9 grade in New Jersey, accredited by the State Board of Education.
In his conditional veto message to the Senate the Governor stated it to be his firm belief that "the sound evolution of our society depends upon extending educational opportunities to those who have the capacity for advancement but lack the financial means." For this reason, he said, he had twice recommended to the Legislature the adoption of a scholarship program. He noted that at a public hearing he had called to learn the views of all interested in the matter, it had generally been agreed by those who spoke, including those who felt the bill should be signed as it stood, that Senate 2 presented a number of difficult problems. The Governor declared it to be "in the public interest to adopt a new scholarship law." His message then called attention to a patent constitutional infirmity which precluded him from accepting the bill in its then form, as well as certain other features of the legislation which, in his view, required correction.
The constitutional infirmity to which the Governor referred was that the bill established a scholarship commission with no attachment to the administrative structure of the State Government, contrary to the mandate of Art. V, Sec. IV, par. 1 of the State Constitution requiring that all administrative offices be allocated by law among and within the principal executive departments. It was his recommendation that the proposed commission be established as an advisory commission to the State Board of Education and within the Department of Education.
The Governor then proceeded to point out that (1) under the proposed legislation scholarships to the six State colleges and to Rutgers Law School, as well as those given as part of the program carried out by the State Rehabilitation Commission, would be cut off. This he considered undesirable. (2) The attempt to fix the number of scholarships on a formula of 5% of the previous year's high school graduating class was unwise; the number ought to be determined *10 by the dollar amount available for appropriation, and by the number of eligible students. (3) Restricting use of the scholarships to in-state colleges was not justifiable because of New Jersey's proximity to the colleges of Pennsylvania and New York and because we did not presently have educational facilities of the size and variety enjoyed by other states, like California and New York. (4) The bill properly required a showing of financial need as well as scholastic promise, but failed to take into account certain situations (which the Governor described) where need should be more realistically assessed. (5) Finally, the scholastic factor could not fairly be tested solely on the basis of a single competitive examination; other relevant factors should be taken into account and standards established as to the relative weight to be given scholastic promise and financial need.
In the light of these observations the Governor recommended to the Senate that it make 35 amendments to the bill. Some of these were of a major character; others were intended by way of clarification and accuracy of expression, or were merely formal.
The conditional veto message was received and read in the Senate on May 11, 1959. On May 18 Senate 2 was reconsidered and passed by a vote of 15-0, "the objections of the Governor to the contrary notwithstanding."
On the same day there was introduced Senate Bill No. 259 entitled:
"An Act to amend and supplement `An Act concerning higher education, providing for the creation, award and administration of State competitive scholarships for use by qualified students in any accredited New Jersey institution of collegiate grade, and repealing section 18:16-33 of the Revised Statutes.'"
The bill was at once advanced to third reading as an emergency measure by a vote of three-fourths of all the members of the Senate (1947 Const., Art. IV, Sec. IV, par. 6), and passed 16-0. However, three days later, on May 21, the *11 bill was reconsidered and placed back on second reading for further consideration. No further action was thereafter taken on the bill.
After Senate 259 had been placed back on second reading, there was introduced Senate Bill No. 264, entitled
"An Act to amend the title and body of `An Act concerning higher education providing for the creation, award and administration of State competitive scholarships for use by qualified students in any accredited New Jersey institution of collegiate grade, and repealing section 18:16-33 of the Revised Statutes.'"
The bill was read the first time by its title, advanced to second reading without reference, passed on second reading, and ordered to have a third reading. Four days later, on May 25, the bill was considered and passed by a vote of 16-0.
Senate 264 was sent to the Assembly on May 25. After passing on second reading, it was advanced to third reading as an emergency measure, under a resolution adopted by more than a three-fourths vote of all the members of the Assembly.
At this point the Assembly, instead of finally voting on Senate 264, took up Senate 2 which had been sent over from the Senate that day with a message that it had been reenacted, "the Governor's objections thereto notwithstanding," and requesting Assembly concurrence. It was then regularly moved that Senate 2 "be reconsidered and that it become a law, the Governor's objections thereto notwithstanding." The motion was adopted by a vote of 48-6 (later changed to 47-7 when an assemblyman requested that his affirmative vote be recorded in the negative).
Directly after this action the Assembly took up Senate 264 on third reading under the emergency resolution and passed the bill by a vote of 47-3.
Following the passage of Senate 2 in the Assembly over the Governor's veto, it was returned to the Senate. The Senate President then delivered it to the Secretary of State, who assigned it chapter number 46 of the Laws of 1959. *12 The Assembly also sent Senate 264 back to the Senate. (We note, in passing, that it was delivered to the Governor subsequent to the hearing and our determination of July 1, but he did not sign it until July 27, 1959. It was given chapter number 150 of the Laws of 1959).

II.
Applicants allege that the Senate, in approving Senate 264, thereby adopted certain amendments to Senate 2, with like effect as though physically incorporated therein, and that from that time on Senate 2 and Senate 264 were, "in contemplation of law, a single instrument albeit contained in two separate documents." Further, that when the General Assembly received these two bills on May 25, it had before it "a single legislative bill," and although it proceeded to approve the same "in two steps and by two votes, its final action constituted, in legal contemplation, a single reenactment, with amendments, of Senate Bill No. 2."
The argument is best stated in the words of the application itself:
"24. In form, the Senate and General Assembly purported to reconsider Senate Bill No. 2 and to pass or approve the same by two-thirds of all the members of each house, and such action, if legally effective would operate to render Senate Bill No. 2 a law upon such approval by the General Assembly on May 25, 1959, pursuant to Article V, Section I, paragraph 14(a) of the Constitution.
25. Applicants allege that despite the form, the substance and effect of the above-described action in the two houses was to amend and reenact Senate Bill No. 2 and that the consequences thereof are governed by the provisions of Article V, Section I, paragraph 14(b) of the said Constitution, under and by which the same did not become a law."
Applicants, by way of conclusion of law, aver that
"* * * the provisions of the Constitution are operative according to the substance and the fact of the action of the Legislature, without regard to the form taken or procedure followed, and * * * the consequences of amending and reenacting a bill which has been returned by the Governor with objections and with recommendation *13 that amendments specified by him be made, are diametrically opposed to the consequences of passing and approving a bill so returned, notwithstanding the Governor's objections. * * *"
The whole point of the argument is that, having been amended, Senate 2 was a new bill requiring the Governor's signature before it could become law.
By way of additional allegations, applicants claim that Senate 2 was approved without there being compliance with other constitutional requirements, in that (a) when the General Assembly reenacted "amended" Senate 2 on May 25, 1959, the bill "was given only a single reading, a full calendar day did not intervene following the day of the second reading, and no resolution by vote of three-fourths of all its members that the said bill was an emergency measure was made," as provided in Art. IV, Sec. IV, par. 6; and (b) after voting that Senate 2 become law notwithstanding the Governor's objections, the Senate, in sending the bill to the General Assembly, failed to forward the Governor's message along with the bill, as required by Art. V, Sec. I, par. 14(a).
It is established law that the statute which the applicants invoke, N.J.S.A. 1:7-1 et seq., permits an attack only upon the procedure of making laws  on the machinery of enactment  and not upon the constitutional validity of the law itself. In re Freygang, 46 N.J. Super. 14, 17 (App. Div. 1957), affirmed 25 N.J. 357 (Sup. Ct. 1957); In re An Act Concerning Alcoholic Beverages, 130 N.J.L. 123, 124 (Sup. Ct. 1943); In re Borg, 123 N.J.L. 104, 106 (Sup. Ct. 1939). Our concern is with the specific action taken by the executive and legislative branches of the State Government, and not with the substantive provisions of the statute itself.
The requirements for passage of all bills and joint resolutions are set forth in the Legislative Article of the 1947 Constitution, Art. IV, Sec. IV, par. 6:
"All bills and joint resolutions shall be read three times in each house before final passage. No bill or joint resolution shall be read a third time in either house until after the intervention of one full *14 calendar day following the day of the second reading; but if either house shall resolve by vote of three-fourths of all its members, signified by yeas and nays entered on the journal, that a bill or joint resolution is an emergency measure, it may proceed forthwith from second to third reading. No bill or joint resolution shall pass, unless there shall be a majority of all the members of each body personally present and agreeing thereto, and the yeas and nays of the members voting on such final passage shall be entered on the journal."
Applicants make no claim of irregularity in the initial passage of Senate 2 by the Senate on January 19, 1959 or by the General Assembly on May 4, 1959. Their attack is focused upon what happened to the bill after the Governor returned it for reconsideration, with his objections.
For a bill to become law in the usual course, the Governor must sign it after it has passed both houses. Art. V, Sec. I, par. 14(a) of the 1947 Constitution provides:
"Every bill which shall have passed both houses shall be presented to the Governor. If he approves he shall sign it, but if not he shall return it, with his objections, to the house in which it shall have originated, which shall enter the objections at large on its journal and proceed to reconsider it. If upon reconsideration, on or after the third day following the return of the bill, two-thirds of all the members of the house of origin shall agree to pass the bill, it shall be sent, together with the objections of the Governor, to the other house, by which it shall be reconsidered and if approved by two-thirds of all the members of that house, it shall become a law; and in all such cases the votes of each house shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively. * * *"
As noted, the Governor did not sign Senate 2; instead, on May 11, 1959 he returned it to the Senate, the house of origin, for reconsideration, with his objections, pursuant to Art. V, Sec. I, par. 14(b), which provides in part that
"* * * The Governor, in returning with his objections a bill for reconsideration at any general or special session of the Legislature, may recommend that an amendment or amendments specified by him be made in the bill, and in such case the Legislature may amend and re-enact the bill. If a bill be so amended and re-enacted, it shall be presented again to the Governor, but shall become a law only if he shall sign it within ten days after presentation; and no bill shall be returned by the Governor a second time. * * *"
*15 Paragraphs 14(a) and 14(b) deal with a single subject matter  the powers and duties of the Governor with regard to bills. Under paragraph 14(a) the Governor, in disapproving a bill, returns it with his objections. This is the conventional veto. Under the quoted portion of paragraph 14(b) the Governor, if he disapproves certain provisions of the bill, may return it with his objections and recommend that an amendment or amendments specified by him be made. This is commonly known as the conditional veto, or qualified veto. If the bill is so amended and re-enacted, it is presented to the Governor and it becomes law only if he signs it within ten days. He may not return the bill with objections and his recommendations a second time. The quoted provision of paragraph 14(b) was clearly intended to take care of a situation where the Governor does not wholly agree with the bill, but approves of it in principle or is willing to accept only portions thereof. If, on reconsideration, both Houses of the Legislature agree with the Governor and include his recommended amendments, a majority vote of all the members of the respective Houses is all that is required.

III.
We dispose, first, of the contention that the Senate, after repassing Senate 2 by more than a two-thirds vote, failed to accompany the bill with the Governor's objections and recommendations when it was sent over to the General Assembly for action. The testimony taken before us clearly establishes that the Governor's message was received in the Senate on May 11, read and entered at large on the Journal, reconsidered, and passed over the Governor's objections. The bill was then sent to the General Assembly, accompanied by the Governor's message; it was received in that House, and was before the Assembly when the vote to reconsider Senate 2, the Governor's objections thereto notwithstanding, was taken. More than two-thirds of the Assembly was recorded in favor *16 of repassing the bill as it stood. The bill was then returned, together with the Governor's message, to the Senate. The requirements of Art. V, Sec. I, par. 14(a), were fully met. The bill was "sent, together with the objections of the Governor, to the other house," where it was reconsidered and approved by a two-thirds vote of all the members. There was, of course, no requirement (as suggested by certain questions put in the course of the July 1 hearing) that the Governor's message be read in the Assembly before the final vote was taken.
The provision of Art. IV, Sec. IV, par. 6, requiring the intervention of a full calendar day following the second reading of a bill, was inapplicable. This section of the Constitution relates to bills and joint resolutions on initial passage, and not to a bill which has been returned by the Governor with his objections.

IV.
We next consider applicants' main attack made upon Senate 2: that Senate 2 and Senate 264 were in contemplation of law a single instrument, and although each House proceeded to approve the bills in two steps and by two votes, the final action taken by the Senate and General Assembly, respectively, constituted in legal contemplation a single reenactment of Senate 2 with amendments.
One of the main objectives of the Constitutional Convention of 1947 was to strengthen the relative position of the executive branch, which under the 1844 Constitution had been the weakest of the three branches of State Government. The Committee on Executive, Militia and Civil Officers, in its Report and Proposals of July 31, 1947 to the Constitutional Convention, declared that it had sought in its recommendations "to bring the powers of the Governor in line with the popular impression of the powers of that office and to provide for a centralization of authority and power in the office of the Governor under reasonable checks and *17 balances, so that the chief executive may be truly responsible to the people for the conduct of the executive branch of the government." 2 Proceedings of the Constitutional Convention of 1947, page 1122. To that end, the Committee, among other things, recommended in its draft article that the veto power of the Governor, which could be overridden by a bare majority, be strengthened to require a two-thirds vote in each House to override; further, that the veto, which then extended to appropriation items, should be modified so as to permit the Governor to reduce an item of appropriation as well as to veto it in its entirety. Ibid., page 1123. The Committee did not in its report to the Convention mention that it had further provided for a conditional veto in its final draft of the Executive Article.
Although the Tentative Draft Proposals of the Committee on Executive, Militia and Civil Officers, filed July 15, 1947, did not mention conditional veto, ibid., page 117, Proposal 3-1, set out at length in its Report and Proposals of July 31, 1947, contained the following language as part of paragraph 14 of Art. V, Sec. I:
"* * * The Governor may, in returning a bill with his objections for reconsideration at any general or special session of the Legislature, recommend in his objections thereto that any amendment or amendments specified therein be made in the bill and the bill shall thereupon be before the Legislature and subject to amendment and re-enactment and may be amended and re-enacted instead of being reconsidered, and if amended and re-enacted it shall again be presented to the Governor and it shall become a law only if he signs it within ten days after presentation to him; and no bill shall be returned by the Governor a second time. * * *" Ibid., page 1131.
(Paragraph 14 was not then divided into (a) and (b); that was done by the Committee on Arrangement and Form.)
The record of the Constitutional Convention of 1947 is completely silent as to just how this provision came to be included in the Report and Proposals of the Committee on Executive, Militia and Civil Officers. There was no reference to the conditional veto in the public hearings on the *18 Tentative Draft Proposals. Nor was the provision discussed in the Committee, whose proceedings are reported in 5 Proceedings of the Constitutional Convention of 1947. It does not appear in the monograph prepared for the Convention dealing with the Governor's veto power, 2 Proceedings of the Constitutional Convention of 1947, page 1418 et seq.
The archives of the Convention, on deposit in the State Library, throw no light on the origin of the conditional veto provision, nor do the records in the possession of the Convention's Archivist and Historian. It was undoubtedly drafted by the Committee's technician and draftsman, and then included in the final Report and Proposals. The provision was in all probability suggested by what appears in the Constitutions of Alabama, Massachusetts and Virginia, set out below. After being drafted, it may have been considered in consultation with the Committee on the Legislative, although the minutes of its sessions (see 3 Proceedings of the Constitutional Convention of 1947) are silent on the subject. The conditional veto was not discussed when the Constitutional Convention considered the Executive Article. In any event, the present language of Art. V, Sec. I, par. 14(b) appears in the final draft of the Constitution adopted by the Convention on September 10, 1947. See 2 Proceedings of the Constitutional Convention of 1947, page 1298.
We see nothing in paragraphs 14(a) and (b) which requires that reconsideration of a bill returned by the Governor with his objections and recommendations of specific amendments is necessarily limited to amending the bill as recommended and returning it to the Governor, as long as two-thirds of both branches of the Legislature vote to override. The conditional veto language of paragraph 14(b) requires that the Governor's recommendations for amendment be accompanied by a veto message because it states that the Governor, "in returning with his objections a bill for reconsideration at any general or special session of the Legislature, may recommend that an amendment or amendments specified by him be made in the bill." The words "with *19 his objections" are exactly those used in paragraph 14(a), which deals with a straight veto, and should have the same meaning attributed to them, for what the Governor is, in effect, doing is to veto the bill qualifiedly  on condition.
But even if the phrase "with his objections," standing alone, is not to be construed as implying a veto message, with the consequent right in the Legislature to override, we must consider the language which follows: "and in such case the Legislature may amend and reenact the bill." This is not the language of mandate. The Legislature is permitted a choice: it may accept the recommended amendments and reenact the bill with them, or it may override the conditional veto.
This construction is borne out by the language immediately succeeding: "If a bill be so amended and re-enacted, it shall be presented again to the Governor." Although paragraph 14(b) does not speak of what should be done if the bill is not "so amended," one cannot reasonably conclude that the Legislature is thereby foreclosed from acting on the bill. To imply any limitation upon the Legislature in choosing to disregard the Governor's objections and recommendations and passing the bill by a two-thirds vote of each House over his objections, would lead to a result certainly not in the contemplation of those who drafted the new Constitution of 1947. To erect such a limitation would, by inference, create an executive power that could arbitrarily frustrate the legislative authority.
We have referred to the conditional veto provisions contained in the Alabama, Massachusetts and Virginia Constitutions. The Alabama provision (Art. V, Sec. 124) clearly indicates that the Legislature may disregard the Governor's objections and recommended amendments, and repass a bill by a majority vote of each house, in which case the bill becomes law. The section reads:
"* * * If the governor's message proposes amendment, which would remove his objections, the house to which it is sent may so amend the bill and send it with the governor's message to the other *20 house, which may adopt, but can not amend, said amendment; and both houses concurring in the amendment, the bill shall again be sent to the governor and acted on by him as other bills. If the house to which the bill is returned refuses to make such amendment, it shall proceed to reconsider it; and if a majority of the whole number elected to that house shall vote for the passage of the bill, it shall be sent with the objections to the other house, by which it shall likewise be reconsidered, and if approved by a majority of the whole number elected to that house, it shall become a law. If the house to which the bill is returned makes the amendment, and the other house declines to pass the same, that house shall proceed to reconsider it, as though the bill had originated therein, and such proceedings shall be taken thereon as above provided. * * *"
The Massachusetts and Virginia Constitutions specifically require that where there is a conditional veto the bill, in whatever form reenacted, be returned to the Governor for approval. Article of Amendment LVI of the Massachusetts Constitution reads:
"The governor, within five days after any bill or resolve shall have been laid before him, shall have the right to return it to the branch of the general court in which it originated with a recommendation that any amendment or amendments specified by him be made therein. Such bill or resolve shall thereupon be before the general court and subject to amendment and re-enactment. If such bill or resolve is re-enacted in any form it shall again be laid before the governor for his action, but he shall have no right to return the same a second time with a recommendation to amend."
And Art. V, Sec. 76 of the Virginia Constitution provides that
"* * * If [the Governor] approve the general purpose of any bill, but disapprove any part or parts thereof, he may return it, with recommendations for its amendment, to the house in which it originated, whereupon the same proceeding shall be had in both houses upon the bill and his recommendations in relation to its amendment as is above provided in relation to a bill which he shall have returned without his approval, and with his objections thereto; provided, that if after such reconsideration, both houses, by a vote of a majority of the members present in each, shall agree to amend the bill in accordance with his recommendation in relation thereto, or either house by such vote shall fail or refuse to so amend it, *21 then, and in either case the bill shall be again sent to him, and he may act upon it as if it were then before him for the first time. * * *"
We therefore conclude that the Governor's use of a conditional veto under paragraph 14(b) cannot destroy the Legislature's basic right under our system to repass a bill in the form sent to the Governor, by the constitutional two-thirds vote of all the members of each House. Had the intention of those who framed the Constitution of 1947 been otherwise, it is certain that so great a limitation on the legislative power would have specifically been set forth in the final draft, and not left to implication.

V.
Despite applicants' insistence that Senate 2 and Senate 264, in contemplation of law, comprised a single instrument, although contained in two separate documents and acted upon by each House of the Legislature in separate steps and by separate votes, the fact remains that Senate 2 was given individualized attention. No use of terms of inference, such as are found in the application under consideration, can change what is entirely patent  that Senate 2 was acted upon separately, and that after it had been repassed Senate 264, an entirely distinct piece of legislation, was likewise acted upon separately.
Senate 2 became law the moment the motion that it "be reconsidered and that it become a law, the Governor's objections thereto notwithstanding," was carried in the Assembly by a more than two-thirds vote. As in the Senate, so in the Assembly, there was no vote on Senate 264 until Senate 2 had been disposed of. Senate 264 was regularly passed by a majority vote after three readings. It had not yet been signed into law when the present application was filed, and so could not in any way detract from the efficacy of Senate 2, which became chapter 46 of the Laws of 1959 after it had been sent to the Secretary of State by the Senate President.
*22 The fact that Senate 264 was intended to amend the State Competitive Scholarship Act in some respects does not detract from what we have said. The effect of Senate 264 was, essentially, to except from the provisions of the new act the scholarships awarded as part of the program of the State Rehabilitation Commission; to allocate the State Scholarship Commission to the State Department of Education; to make not more than 15% of the total number of scholarships awarded in any year available for use in approved colleges outside the State; and to permit the State Scholarship Commission to expend such part of any sums appropriated for the fiscal year 1959-60 as might be necessary to set up the state-wide scholarship program. These amendments, and particularly the one allocating the State Scholarship Commission to the State Department of Education, were obviously inspired by the Governor's recommendations accompanying his conditional veto. The Legislature chose to remedy the constitutional defect in Senate 2 and to adopt a very limited number of the many recommendations made by the Governor, and no more. In its judgment, the legislation it had adopted was all that was necessary to establish and carry forward a state competitive scholarship program. Whether the program was as well considered and soundly based a one as might have been devised is not for this court to say. Time and experience will provide the answer.
That Senate 264 followed directly after the action on Senate 2 is of no moment. It could have been passed the next day, the next week, or the next month, and in any case would have been equally efficacious as an independent piece of legislation, representing as it did a valid exercise of the legislative power to amend a prior enactment. The shortness of the time interval attending its passage after Senate 2 had finally been acted upon could not bring about the result which applicants claim  an integration with Senate 2 so as to constitute, in legal contemplation, a single enactment and hence a new bill.

*23 VI.
Applicants base most of their argument that Senate 2 and Senate 264 must be considered a single reenactment, with amendments, of Senate 2, on what they describe as the certifications of the Speaker of the General Assembly attached to the two bills.
Appearing directly after the printed text of Senate 2, as filed with the Secretary of State, and stapled thereto, are two sheets: on the first there appear recitals (over the respective signatures of the Senate President and the Assembly Speaker) that the bill had received three readings and passed in the Senate on January 19 and in the Assembly on May 4, 1959. The second sheet recites (over the signature of the Senate President) that the bill had been returned by the Governor to the Senate with his objections, which had been entered at large on the Senate Journal, and that the Senate then reconsidered the bill and passed it on May 18, 1959 by a two-thirds vote, the objections of the Governor to the contrary notwithstanding. In the next column on this sheet there appears the following:
 "GENERAL ASSEMBLY,
 May 25, 1959,
This bill having been sent to the General Assembly by the Senate, together with the objections of the Governor thereto, the General Assembly proceeded to reconsider said bill; and by a two-thirds vote of all of the members thereof
RESOLVED, That the same do pass, the objections of the Governor to the contrary notwithstanding;
48 members voting for, and 6 members voting against the passage of the bill. By order of the General Assembly
 See Next Sheet
 Speaker of the General Assembly"
"See Next Sheet" is in the handwriting of the Speaker. One is thereby referred to what appears on the lower half of the first sheet, undoubtedly employed for the purpose because it was so ready at hand, reading as follows:
*24
 "GENERAL ASSEMBLY,
 May 25, 1959
This bill having been three times read and compared in the General Assembly,
RESOLVED, That the same do pass as amended by Senate #264.
By order of the General Assembly.
 William Kurtz
 Speaker of the General Assembly"
The words "by Senate #264" are in the handwriting of the Speaker.
In the case of Senate 264 there is stapled to the bill as finally passed a sheet reciting (over the signature of the Senate President) that the bill had been read three times in the Senate and been passed on May 25, 1959. In the next column appears the following:
 "GENERAL ASSEMBLY
 May 25, 1959
This bill having been three times read and compared in the General Assembly,
RESOLVED, That the same do pass, as amendments [sic] to S2.
By order of the General Assembly.
 William Kurtz
 Speaker of the General Assembly"
The words "as amendments to S2" were written in by the Speaker.
Applicants claim that these certifications are binding and conclusive upon the court and establish the integration of the two bills. We do not agree.
In the first place, the Constitution of 1947 does not require the presiding officers of the two houses of the Legislature to sign bills. See Art. IV, Sec. IV, par. 6; and Art. V, Sec. I, pars. 14 and 15. It has been said that in such case the signatures are not considered essential; the bill may become a law even without them, since they are no part of the legislative process and are designed solely to verify the passage of the bill. See 1 Sutherland, Statutory Construction (2d ed. 1943), § 1304, p. 221.
*25 Secondly, the Assembly minutes following the voting record on the repassage of Senate 2 read:
"Ordered, that the Speaker sign the said bill, and that the Clerk carry it to the Senate and inform the Senate that the General Assembly has passed the same, without amendment."
Exactly the same language appears after the Assembly vote on Senate 264. Two things immediately strike the eye: (1) the only direction to the Speaker was that he sign the bill  nothing more; (2) the Senate was to be informed that the General Assembly had passed each bill without amendment. There was absolutely no authority for the Speaker inserting the language he did in the so-called certification to each bill.
We have observed that when Senate 2 was repassed by the Assembly, there was as yet no final action on Senate 264. The Speaker's certification to Senate 2, "as amended by Senate #264" was therefore without factual support.
One other thing is deserving of mention in connection with the Speaker's certification of Senate 2. The certification speaks of "This bill having been three times read and compared in the General Assembly." Obviously, the bill was not read three times; after it had come over from the Senate the Assembly took the bill as it stood and voted to override. In short, the minutes of the Assembly show that the certification on its face was without factual basis and without authority.
Applicants, however, contend that our consideration is limited to the certification, and that we may not consult the Assembly minutes. They rely on Pangborn v. Young, 32 N.J.L. 29 (Sup. Ct. 1866). Chief Justice Beasley there held that where an act of the Legislature, duly authenticated as such, was on file in the office of the Secretary of State, an exemplification of such act in due form was conclusive evidence of its existence and contents, and that it was not competent for the court to go behind such attestation or to receive the evidence of the journals *26 of the Houses to show that the law as actually passed varied from that on file with the Secretary of State. Pangborn was decided in 1866. On March 3, 1873 the predecessor act of what is now N.J.S.A. 1:7-1 et seq., under which the present proceedings are taken, was passed. L. 1873, c. 116; 4 C.S. 4978. By that act the Legislature on its own motion relaxed the Pangborn doctrine to permit an attack upon a statute as not having been enacted in the manner provided by the Constitution. In re Low, 88 N.J.L. 28, 30 (Sup. Ct. 1915). The present statute authorizes a full judicial inquiry into the regularity of the passage of any statute, N.J.S.A. 1:7-2 and 3, upon application of the Attorney General (at the direction of the Governor) or any two or more citizens of the State, brought within one year after the law has been filed with the Secretary of State. N.J.S.A. 1:7-1 and 4.
We are not limited to a consideration of the bill itself, as filed in the office of the Secretary of State. The journal of each House is a competent source of evidence. 1 Sutherland, op. cit., § 1304, p. 221. And see In re Low, above, 88 N.J.L., at page 31; Simon v. State, 86 Ark. 527, 111 S.W. 991 (Sup. Ct. 1908). We have no hesitation in holding that an erroneous signature or certification may be attacked by reference to the minutes of either House of the Legislature, if necessary. The statute, N.J.S.A. 1:7-1 et seq., affords this court the widest scope in the matter of evidence. In re Jaegle, 83 N.J.L. 313 (Sup. Ct. 1912), and In re Public Utility Board, 83 N.J.L. 303 (Sup. Ct. 1912), cited by applicants, are not to the contrary.
Applicants would endow the Speaker's certification with a greater solemnity than the minutes of the Assembly because of its rules, adopted pursuant to the 1947 Constitution, Art. IV, Sec. IV, par. 3, which authorizes each House to determine the rules of its proceedings. Thus, Rule 4:8, referring to the Speaker's duties, states generally that he "shall sign all acts, addresses and joint resolutions." New Jersey Legislative Manual (1959), p. 730. Rule 15:18 directs *27 the Speaker to sign any bill, joint resolution or concurrent resolution passed by the Assembly. Ibid., p. 745. This rule, read in its context, has reference to matters originating in the Assembly, and not to a situation like the present one. More in point is Assembly Rule 20:4, ibid., p. 751, relating to a bill originating in the Senate, passed by both Houses, presented to the Governor, and then returned by him to the Senate with his objections, with or without recommendation for amendment. After the Senate has reconsidered the bill and agreed to pass it by a two-thirds vote of all members, the Governor's objections to the contrary notwithstanding, the bill is to be sent to the Assembly, and if approved there by a two-thirds vote, "the same shall be returned to the Senate certified by the Speaker of the General Assembly, that the General Assembly reconsidered the bill with the date thereof and that two-thirds of the members of the General Assembly agreed to pass the bill, the objections of the Governor to the contrary notwithstanding." The rule speaks for itself; it limits the certification to exactly what is expressly stated in the rule. The Speaker may not place his own construction upon the action taken in the Assembly, particularly when it flies in the face of what actually took place. Certainly, the Speaker has no authority to certify to things which never happened  here, for example, that Senate 2 had been "three times read," and that "the same do pass as amended by Senate #264." The Assembly minutes clearly state that Senate 2 was reenacted, the Governor's objections notwithstanding, and directed that "the Speaker sign the said bill and that the Clerk carry it to the Senate and inform that body that the Assembly had passed the same, without amendment."
Our courts have held that applicants who challenge the validity of a statute as not having been passed in the manner provided by the Constitution, must establish the truth of what they assert by clear and convincing evidence. This is the rule which guides the court in exercising its functions under N.J.S.A. 1:7-3:
*28 "After a full hearing the court may, if satisfied that the constitutional and statutory provisions relating to the enactment and approval of laws and joint resolutions have not been complied with, adjudge the law or joint resolution or any part thereof to be void."
In re An Act Concerning Alcoholic Beverages, above, 130 N.J.L., at page 125; In re Petition of Attorney General, 98 N.J.L. 586 (Sup. Ct. 1923); In re Low, above, 88 N.J.L., at pages 30-31. It is also well settled that our courts will not set aside the actions of the Legislature unless the unconstitutionality of what has been done is manifest. In re Petition of Attorney General, above, 98 N.J.L., at page 590. We hold that applicants have clearly failed to discharge the burden of proof which is theirs.

VII.
We need not consider applicants' argument that Senate Bill No. 259 is a further indication that what the Legislature did here was to reenact Senate 2 with amendments. Senate 259, as explained in section I of this opinion, was passed by the Senate, reconsidered and placed back on second reading for further consideration, and thereafter no further action was taken on the bill. There was nothing more here than a still-born legislative intention to act.
For the reasons herein set forth at length, the application is dismissed.