STATE OF NEW JERSEY, PROSECUTOR-APPELLANT, v.
VINCENT MURZDA, DEFENDANT-RESPONDENT.

Submitted October 25, 1935—Decided January 31, 1936.

For the appellant, *Sidney Goldmann* (*Edward J. O'Mara* and *Charles Hershenstein,* special assistants to the attorney-general, of counsel).

For the respondent, *George Pellettieri.*

The opinion of the court was delivered by

HEHER, J. The state challenges the judgment of the Supreme Court, setting aside the conviction of respondent, in the First District Police Court of the City of Trenton, of the offense of possessing "number lottery slips pertaining to a number lottery," in violation of chapter 133 of the laws of 1934. *Pamph. L.* 1934, *p.* 364.

The decisive question is whether the pertinent provision of the statute, subdivision (c), classifying as a disorderly per-

son one "who shall have in his possession or custody any lottery slips, books or records pertaining to a lottery," is in contravention of Article IV, Section VII, subdivision 2, of the state constitution, in terms following:

"No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished."

This provision was introduced into our organic law by an amendment adopted on September 27th, 1897; and the inquiry is whether it served to incorporate therein the then existing chapter 293 of the laws of 1895 (*Pamph. L.* 1895, *p.* 593), denominating a misdemeanor the knowing possession of "any paper, document, slip or memorandum that shall pertain in any way to the business of lottery-policy, so-called," and so to deprive the legislature of the authority to give the offense in question the lesser grade or classification, both in respect of its character and the punishment therefor.

We resolve this inquiry in the negative. Gaming was not a crime at common law. Wagers and like contracts were not objectionable *per se.* Gaming was unlawful only when it was tainted with fraud, or constituted a nuisance, or for some special reason ran counter to public policy. *Flagg* v. *Baldwin,* 38 *N. J. Eq.* 219; 12 *R. C. L.* 708. It follows that the possession of lottery tickets and kindred articles associated with gaming was not a criminal offense at common law, and it is therefore a fit subject of prosecution and punishment in summary proceedings, unless such punitive legislative action is within the inhibition of the constitutional limitation under consideration. It falls into the category of what the common law denominated "minor" offenses—one that is not in its nature indictable, but is properly classable as disorderly conduct. It is essentially a police regulation designed to make effective the constitutional lottery interdiction. See *State*

v. *Rodgers,* 91 *N. J. L.* 212; *State* v. *Anderson,* 40 *Id.* 224; *State* v. *Lakewood Market Co.,* 84 *Id.* 512 (at *p.* 524); *Levine* v. *State,* 110 *Id.* 467.

A state constitution, unlike the federal constitution, is not a grant but a limitation of legislative power. The state legislature exercises a portion of the sovereign power residing in the people, subject to the limitations imposed by the federal constitution and its own organic law, and, as well, those so fundamental in the social compact as to be necessarily implied; and, in the ascertainment of the scope and effect of such constitutional limitations, courts are enjoined, as in the construction of statutes, to collect the sense and meaning of the clause by comparing one part with another, and by considering all the parts as a whole, and not one part as a separate and independent provision bearing no relation to the remainder.

This is the primary rule of exposition of constitutional provisions, as well as statutory enactments. The thing sought is the intent of the people in imposing the constitutional restraint; and, in the absence of ambiguity calling for permissible extrinsic aids, this is to be found in the instrument itself. And, in general, the established canons of statutory interpretation are the rules by means of which that intent is to be resolved. The purpose of judicial interpretation is the discovery of "the true sense of the form of words which are used * * *, taking all its parts into consideration, and, if fairly possible, giving them all effect." *Orvil* v. *Woodcliff,* 64 *N. J. L.* 286. Whether the subject-matter of such interpretative inquiry be an agreement between parties, a statute, or a constitution, the object is "the thought which it expresses." *Newell* v. *People,* 7 *N. Y.* 9, 97.

But, in the quest for the intention and meaning of a constitutional limitation, its essence and nature must ever be kept in mind. The primary design of a constitution is to put the fundamentals of government beyond the control of "the varying moods of public opinion," to borrow the language of Judge Cooley (*Cooley's Constitutional Limitations* (*8th ed.*) 124); and it is therefore to be presumed that the words

employed have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication. *Wolcott* v. *Wigton*, 7 *Ind*. 44; *People* v. *Purdy*, 2 *Hill* 31; *Cooley Const. Lim.* 128. A constitutional prohibition against the exercise of a particular power is in the nature of an exception; and it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the constitution is so manifest as to leave no room for reasonable doubt. The constitutional limitation upon the exercise of legislative power must be clear and imperative. This is a well defined limitation engrafted upon the function assumed by the courts, federal and state, to nullify a statute for unconstitutionality. *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504; *Attorney-General* v. *McGuinness*, 78 *N. J. L.* 346, 369; *Sexton* v. *Newark District Telegraph Co.*, 84 *Id.* 85; *affirmed*, 86 *Id.* 701; *Bott* v. *Secretary of State*, 63 *Id.* 289, 302. See, also, *Marbury* v. *Madison*, 1 *Cranch* 137; 2 *L. Ed.* 60. There is to be no forced or unnatural construction. Such constitutional limitation upon the general legislative power "is to be established and defined by words that are found written in that instrument, and not by reference to some spirit that is supposed to pervade it or to underlie it or to overshadow the purposes and provisions expressed in its written language." *State* v. *DeLorenzo*, 81 *N. J. L.* 613. See, also, *Sturges* v. *Crowninshield*, 4 *Wheat.* 122; 4 *L. Ed.* 529.

Coming now to the limitation under review, we perceive therein no intention to impart a constitutional basis and character to the statutory crime of possession of lottery tickets or slips, or documents relating to a lottery or other form of gaming. We find no purpose to put such possession as a substantive offense beyond legislative control. The amendment explicitly deals with the conduct of lotteries and games within the unlawful category, and the sale and purchase of lottery tickets; but it makes no provision respecting the possession of lottery tickets or slips, or books, records or memoranda pertaining to that particular form of gaming. It was designed to strip the legislature of the power to permit lotteries, or

to sanction the sale or purchase of lottery tickets within this state, or to authorize pool-selling, book-making or gambling in any form. These things are directly enjoined. Then the amendment goes on to provide that "no gambling device, practice or game of chance now prohibited by law," shall be legalized or the punishment therefor diminished.

The latter is the pertinent clause; and it plainly refers to the play that is denominated gaming, and not to the mere possession of tickets, slips, books, records or memoranda used in the conduct or operation of unlawful games. The *legalization* of all forms of gaming *then prohibited by law,* and the diminishment of "the remedy, penalty or punishment" prescribed "therefor" were the things placed beyond legislative control.

While the words of a constitutional limitation are, for obvious reasons, to be taken in their natural and ordinary sense, significance and import, and regard is to be had to their general and popular usage, unless terms of art are employed, which are to be given their technical sense, the intent, as we have stated, is not to be collected from any particular expression, but from a general view of the whole clause. It is an established canon of interpretation, in aid of the primary rule adverted to, and applicable alike to all written instruments, that the meaning of words may be indicated or controlled by those with which they are associated. *Noscitur a sociis.*

This maxim, grounded in grammar and firmly established as a rule of exposition since its adoption by Lord Hale, merely embodies and gives specific application to the general principle that the true sense of a particular word or expression is to be gathered from the context. See *Hay* v. *Earl of Coventry,* 3 *T. R.* 83, 86; *Bishop* v. *Elliott,* 11 *Exch.* 113; 10 *Id.* 496, 519; *Lewis' Sutherland Statutory Construction (2d ed.)* 414; *Dwarres on Statutes* 702, 703. As stated by Lord Bacon, the coupling of words together ordinarily evinces an intention that they are to be understood in the same general sense. 4 *Bacon's Work* 26. Under this rule, the natural, ordinary and general meaning of terms and expressions may be limited,

qualified and specialized by those in immediate association, although it is the intent gathered from the whole context that is to ultimately prevail. Words which, standing alone, might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law. *Coke's Littleton*, 381a; *Downes* v. *Bidwell*, 182 *U. S.* 244; 21 *S. Ct.* 770; 45 *L. Ed.* 1088; *Cooley Const. Lim.* 127, 129.

The term "gambling device," has no settled and definite meaning; it was not defined by the common law. *State* v. *Mann*, 2 *Or.* 238. Unless specifically defined, it takes its meaning from the surrounding words and expressions, and, when given the restricted significance of implements, instruments or apparatus used in the unlawful play or game, that is ordinarily the intention found in the context. *State* v. *Mann, supra; State* v. *Shaw*, 39 *Minn.* 153; *In re Lee Tong*, 18 *Fed. Rep.* 253; *State* v. *Mann*, 13 *Tex.* 61. As employed here, it does not comprehend the "papers, documents, slips or memoranda," pertaining "in any way to the business of lottery-policy," possession of which was made unlawful by the act of 1895, *supra*. It is manifest that the term is used in the limited, special, associated sense of a scheme, plan or arrangement that in its essence is gaming, within the intendment of the then existing statutes, and not in the broad, generic sense of "papers, documents, slips and memoranda," relating to the "business of lottery-policy"—things that are mere incidents to the attainment of the unlawful plan or purpose. The language used is patently not appropriate to the explicit and indubitable expression of such a purpose. Compare *State* v. *Shaw, supra*.

Any doubt as to this is dispelled by the provision proscribing the sale and purchase of lottery tickets, notwithstanding that section 52 of the existing Crimes act of 1874 denounced such offenses as misdemeanors. *General Statutes* 1895, *p.* 1059. Thus the sale and purchase of lottery tickets, as distinguished from the lottery itself, is made the subject of a specific inhibition, while the bare possession of such tickets is not. This is conclusive of an intention and purpose not to incorporate in the fundamental law the statutory provision

relating to possession. It makes evident a design not to oust the legislature of authority to deal with the mere possession of slips, papers and documents pertaining to that form of gaming. Moreover, it indubitably demonstrates that the term "gambling device" was used in the qualified, restricted sense mentioned; if not, the provision would be superfluous.

The statute denounces offenses, such as the keeping of a room or house for gaming purposes, and the landlord or his agent knowingly permitting the demised premises to be used for the conduct of a lottery business, which are manifestly not within this limitation of legislative authority. The provisions of the revised Crimes act of 1874 pertinent to this inquiry are sections 50-55, 222-226, 274-281, 284, and 285-287. *General Statutes* 1895, *pp.* 1059, 1060, 1090, 1101, 1102, 1103.

And it is to be borne in mind that neither purchase of the ticket, nor the possessor's intent to sell it, or to participate in a lottery, is an ingredient of the possession made punishable by the statute under consideration, nor its predecessor act of 1895, *supra*. The possession of such tickets or slips may not be characterized by an intent to put them to an unlawful use. Yet it tends to create both opportunity and temptation to infringe the law against lotteries; and the object of the statute is plainly to strike at the evil in its inception by a measure that is primarily preventive in character. Compare *Levine* v. *State, supra*. The amendment was not intended to limit this legislative function. The statute is therefore constitutional.

The judgment of the Supreme Court is reversed, and the judgment of the Police Court affirmed; and the cause is remanded with direction to execute the latter judgment.

*For affirmance*—CASE, WELLS, JJ. 2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, LLOYD, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, JJ. 10.