67 N.J. Super. 39 (1961)
169 A.2d 822
IN THE MATTER OF THE APPLICATION OF JOSEPH LAMB, JOHN ANDRYSZCZYK, JAMES COHENNY, RAYMOND MURRAY, ALFRED T. DAVIS AND THOMAS LENAHAN, APPLICANTS, FOR AN ADJUDICATION THAT CHAPTER 1, LAWS OF 1961, AN ACT ENTITLED "AN ACT TO IMPLEMENT ARTICLE IV, SECTION III OF THE CONSTITUTION AND TO RESCIND SECTIONS 52:10-1 AND 52:10-2 OF THE REVISED STATUTES" IS VOID PURSUANT TO CHAPTER 7 OF TITLE 1 OF THE REVISED STATUTES OF 1937.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1961.
Decided April 5, 1961.
*42 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Maurice C. Brigadier argued the cause for the applicants (Mr. Seymour Margulies, associate counsel and on the brief).
Mr. Theodore I. Botter, Assistant Attorney General, argued the cause for respondent State of New Jersey (Mr. David D. Furman, Attorney General, attorney; Mr. Theodore I. Botter, Assistant Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
These proceedings were initiated by seven citizens of the State of New Jersey, residents of the County of Hudson, questioning the constitutionality of the enactment procedure of the Legislature in the passage of chapter 1, Laws of 1961. Applicants' petition was filed *43 with this court pursuant to N.J.S.A. 1:7-4. It was alleged in their petition that the aforesaid statute is void on the ground that the same was not duly passed by both houses of the Legislature in a manner required by the State Constitution.
On March 6, 1961, the date of the filing of said petition, applicants, together with the Attorney General appearing at the direction of the Governor for the purpose of defending the constitutionality of the challenged legislation, requested instructions from this court as to the judicial procedure to be followed and for the scheduling of an early hearing date on the petition, at which time the matter was set down for argument on March 20. The applicants were directed to give notice thereof to each of the county clerks of the several counties of the State of New Jersey and to the clerks of the New Jersey Senate and the New Jersey Assembly, respectively. There is no genuine issue as to any material fact in dispute and the essential facts have been stipulated and briefs submitted.
Applicants' motion for judgment on their petition and the cross-motion by the Attorney General as well as his motion for summary judgment of dismissal were made and orally argued before this court on the hearing date so scheduled. No additional appearances have been entered in the cause.
Our judicial inquiry in these proceedings is limited to the constitutionality of the legislative procedure of enactment and does not extend to the constitutionality of the statute enacted. In re McGlynn, 58 N.J. Super. 1 (App. Div. 1959); In re Freygang, 46 N.J. Super. 14 (App. Div. 1957), affirmed per curiam 25 N.J. 357 (1957); In re An Act Concerning Alcoholic Beverages, 130 N.J.L. 123 (Sup. Ct. 1943).
The legislative history and facts may be briefly summarized as follows:
The legislative year commenced with the opening session on January 10, 1961. On January 30, 1961, both branches *44 of the Legislature convened and respectively adopted a concurrent resolution to meet in joint session that afternoon in the Assembly Chambers for the purpose of receiving the annual budget message of the Governor.
Thereafter the Senate reconvened and Senate Bill No. 65, entitled "An Act to implement Artivle IV, Section III of the Constitution and to rescind Sections 52:10-1 and 52:10-2 of the Revised Statutes," was introduced, received first reading by its title and, under suspension of rules as an emergency measure, was advanced for the required number of readings, submitted to vote and affirmatively passed by 17 votes, none in the negative. The General Assembly likewise reconvened after the joint session and embarked upon its usual business. The Speaker of the House was advised that Senate Bill No. 65 had passed in the upper house. No action, however, was taken thereon by the Assembly before it adjourned. Notwithstanding the presence of the Majority Leader John W. Davis in the Assembly and the fact that motions for adjournment in that chamber are "usually and customarily made by the Majority Leader if he is present," Assemblyman Hauser was recognized by the Speaker of the Assembly and he offered the following resolution, which was not made on behalf of the Majority Leader:
"Be It Resolved, That when the General Assembly adjourns, it be to meet on Thursday, February 2, at 10 o'clock A.M., and that when it then adjourn it be to meet on Saturday, February 4, at 10:00 o'clock A.M., and that when it then adjourn it be to meet on Monday, February 6, 1961 at 11:00 o'clock A.M., Eastern Standard Time."
This resolution passed.
Later the same day, January 30, the Governor sent telegrams to all members of the General Assembly calling them back on Wednesday, February 1, 1961. They read:
"I am calling a session of the General Assembly for Wednesday, February 1, 1961, at 11:00 A.M. to act on reapportionment. The public interest requires this session." *45 and in the telegrams to the Democratic members an additional paragraph was included advising them that "A meeting of all Democratic members of the General Assembly will be held in my office at 9 A.M. the same day."
There are two vacancies in the General Assembly, 58 members presently occupying seats therein; 57 of the 58 members responded in person to the Governor's call and were in session on Wednesday, February 1, 1961. The only absent member was Assemblyman Martin who, on January 31, 1961, telegraphed the Governor advising him that previous business commitments would prevent his attendance.
The minutes of the General Assembly disclose that the Assembly convened at 11:50 A.M. on February 1, 1961, 54 members answering the morning roll call. A resolution was passed rescinding the January 30 motion of adjournment, and was followed by a resolution constituting the General Assembly as meeting in regular session at 11 o'clock on Wednesday, February 1, 1961. Assemblyman Hauser voiced opposition to the proceeding as illegal and unconstitutional on the single ground that "the Governor cannot convene the Assembly alone." Assembly Minutes, February 1, 1961, p. 169. Whether or not his objection was made before or after the adoption of said resolution has not, as a factual matter, been resolved; but it is clear that no action was sponsored or taken on the objection and that Assemblyman Hauser thereafter participated in the session and voted upon the resolutions considered.
On motion, the General Assembly was placed under call, 55 votes being cast in the affirmative (including the vote of Assemblyman Hauser), none in the negative, 3 absent. When the Assembly reconvened that afternoon at 1:30 P.M., 56 members answered the roll call; Assemblymen Martin and Werner did not. Werner, although absent at the roll calls, was present during the session and voted on resolutions which were considered during the morning and afternoon sessions. The only absent member was Assemblyman *46 Martin, who had telegraphed the Governor as to his inability to be present.
Senate Bill No. 65 was considered during that afternoon session and, under suspension of the rules without committee reference, was passed by a vote of 44 in the affirmative and 10 in the negative. Assemblyman Hauser participated by voting in the negative. The emergency measure resolution which preceded its passage (as required by Art. IV, Sec. IV, par. 6 of the 1947 Constitution) received 45 votes in the affirmative, 1 in the negative. That same afternoon the bill was duly signed, sent to the Governor, approved by him and filed with the Secretary of State, and was designated as chapter 1, Laws of 1961.
It was stipulated that this court may take judicial notice of the facts pertaining to the apportionment of the New Jersey Assembly representation as they relate to the failure to reapportion since 1950, the numerous bills introduced to accomplish reapportionment, the circumstances of the Asbury Park Press, Inc. v. Woolley case, 33 N.J. 1 (1960), and that an appeal in those proceedings was reactivated and reargued before the New Jersey Supreme Court on January 23, 1961; and that on Tuesday, January 31, 1961, John Gildea, clerk of the court, notified the press that a decision of the Supreme Court of New Jersey in that litigation would be handed down by the court in Newark at 5 P.M. on February 1, 1961. The announcement of the court's intention to render its decision was publicized in the press and became generally known throughout the State. Late in the afternoon of February 1, 1961, it was announced that the Supreme Court would not render an opinion in the Asbury Park Press case, as the issue raised therein had become moot.
Applicants predicate their contention upon three major points which were briefed and argued. They are: the Governor did not lawfully convene or call or assemble the General Assembly on February 1, 1961; the General Assembly has no power to convene itself in adjournment, especially *47 without giving notice of its intention to enact legislation; and the public cannot be estopped from requiring the law makers to comply with the law.

I.
Applicants advance the doctrine of separation of powers and refer to Article III of our 1947 New Jersey Constitution, entitled "DISTRIBUTION OF THE POWERS OF GOVERNMENT" and providing:
"The powers of the government shall be divided among three distinct branches, the legislative, executive and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."
It is urged that the Governor cannot exercise any legislative function or power except as expressly provided in the Constitution and that there can be no implied powers in any one of the three distinct branches vis-a-vis any other.
Webster defines "expressly" to mean "in direct terms." It is true that our Constitution of 1947 does not "in direct terms" empower the Governor to convene or call or assemble the General Assembly as such. It does not necessarily follow that he is constitutionally limited from so doing. The word "expressly" should not be carved out of its context. The constitutional mandate is against one branch of government exercising "any of the powers properly belonging to either of the others, except as expressly provided in this Constitution." We must, accordingly, look to the entire instrument.
The various provisions of our Constitution with respect to the three divisions of government must be read, analyzed and interpreted together in determining the intended objectives of this fundamental and basic document. Note in particular:
Article V, Section I, par. 11, first sentence:
"The Governor shall take care that the laws be faithfully executed."
*48 Article V, Section I, par. 12:
"The Governor shall communicate to the Legislature, by message at the opening of each regular session and at such other times as he may deem necessary, the condition of the State, and shall in like manner recommend such measures as he may deem desirable. He may convene the Legislature, or the Senate alone, whenever in his opinion the public interest shall require. * * *" (Emphasis supplied).
Article IV, Section I, par. 4:
"Special sessions of the Legislature shall be called by the Governor upon petition of a majority of all members of each house and may be called by the Governor whenever in his opinion the public interest shall require."
Article IV, Section IV, par. 5:
"Neither house, during the session of the Legislature, shall, without the consent of the other, adjourn for more than three days, or to any other place than that in which the two houses shall be sitting."
Article IV, Section III, par. 1:
"* * * The present apportionment shall continue until the next census of the United States shall have been taken. Apportionment of the members of the General Assembly shall be made by the Legislature at the first session after the next and every subsequent census, and each apportionment when made shall remain unaltered until the following census shall have been taken."
On January 30, 1961 all five of these constitutional provisions were to be taken into consideration when the Governor was confronted with the reapportionment problem which he had determined to be an emergency situation seriously affecting the public interest.
The Legislature had not adopted reapportionment legislation since 1941, notwithstanding the constitutional directive, the 1950 census and the population changes during the preceding decade, and notwithstanding the continuing population changes reflected in the recent census of 1960. *49 The fact that there is a continuous obligation on the part of the Legislature to reapportion was settled in Botti v. McGovern, 97 N.J.L. 353 (Sup. Ct. 1922), wherein the court, at page 356, said:
"* * * In our opinion, the right of the inhabitants of the several counties of the state to be accorded the representation in the lower house, provided by the constitution, cannot be defeated by such non-action of the legislature."
Citizens and taxpayers had already instigated litigation, Asbury Park Press, Inc. v. Woolley, supra, seeking judgment declaring that the 1941 apportionment law is now unconstitutional and requesting injunctive relief to prevent the holding of a general or primary election of the Assembly under that law. The Supreme Court made it clear that reapportionment is a duty committed by the Constitution to the Legislature. Noting that some of the defendants had suggested that the remedy sought would create chaos and anarchy and that the State Government would be completely disrupted, it stated (33 N.J., at page 15):
"* * * A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an in terrorem argument based upon the notion that members of a coequal part of the government will not be just as respectful and regardful of the obligations imposed by their similar oath. Any less faith on our part would be an unbecoming and unwarranted reflection on the Legislature."
and, at page 21, further remarked:
"For the reasons stated, we shall withhold determination of the various problems presented (except, of course, that of our jurisdiction to hear the matter) in order that the Legislature may have an opportunity to consider adoption of a reapportionment act when the preliminary 1960 census data have been made available by the Federal authorities. * * *"
Two justices of that court in a concurring opinion indicated their thinking to be in terms of a possible injunctive mandate to appropriate election officials if the Legislature *50 did not act within a reasonable time in advance of the primary election in 1961.
The Asbury Park Press proceedings were reactivated and the matter reargued on January 23, 1961. The Supreme Court's decision was imminent. We may take judicial notice that the primary election will be held April 18, 1961. N.J.S.A. 19:23-40.
It is apparent that the Legislature had ignored, since 1941, its constitutional responsibility to reapportion, resulting in a continuing imbalance in the General Assembly representation. The consequences of judicial action pending the primary election were of paramount public concern. The Legislature was in a general session; it had not adjourned sine die. To meet this emergency, the Senate, on January 30, 1961, had adopted a reapportionment bill (Senate Bill No. 65), and the General Assembly, without acting thereon, had effected an interim adjournment  in effect, a temporary suspension of its regular session business.
It was under these circumstances that the Governor, charged with the constitutional obligation to "take care that the laws be faithfully executed" (Art. V, Sec. I, par. 11, supra) and to recommend to the Legislature at its opening session and "at such other times as he may deem necessary * * * measures as he may deem desirable" (Art. V, Sec. I, par. 12, supra), and faced with a critical situation of grave concern to the public requiring the General Assembly to consider emergency legislation which the Senate had already adopted, called the Assembly back into session on February 1, 1961. (Emphasis added.)
The applicants concede in their brief that the Constitution permits the Governor to convene the Legislature or the Senate alone (Art. V, Sec. I, par. 12), and that he must, on petition of a majority of all the members of each house, call a special session of the Legislature (Art. IV, Sec. I, par. 4). Otherwise, they contend that the Governor lacks power to convene or call into meeting a branch of the Legislature.
*51 It should be pointed out in limine that Art. IV, Sec. I, par. 4, relates only to special sessions of the Legislature. This would have no application to the case under review because the Legislature was in regular session subject only to interim adjournments under the constitutional restrictions specified in Art. IV, Sec. IV, par. 5, supra. The Governor did not issue a proclamation calling a special session of the Legislature, and properly so.
The section of the Constitution dealing with "special sessions" was a new provision incorporated in the 1947 Constitution, see Milmed, The New Jersey Constitution of 1947, N.J.S.A., Constitution, p. XVIII, and is to be distinguished from Art. V, Sec. I, par. 12, which empowers the Governor to convene "the Legislature, or the Senate alone" whenever in his opinion the public interest shall require. Part of this language finds its origin in the 1844 Constitution, Art. V, Executive, Sec. 6. The words "or the Senate alone" were for the first time introduced by the September 28, 1875 amendment to the 1844 Constitution. Research of the Constitutional Convention Proceedings of 1947, all available records respecting the 1875 constitutional amendment, the State Archives and even the newspapers of the day, does not bring to light any helpful interpretative information. The obvious reason for the 1875 amendment, "or the Senate alone," and its inclusion in the 1947 revision, was to enable the Governor to convene the Senate at any time, even after an adjournment sine die, for the purpose of confirming executive nominations and appointments, without the necessity of calling a special session of the Legislature.
It is significant that the Constitution does not vest in the Legislature the power to convene itself or to call itself into special session. This power is vested in the Governor alone. Our Constitution contemplates that the Senate and General Assembly shall meet and organize separately on the second Tuesday of January of each year, at which time the legislative year commences, Art. IV, Sec. I, par. 3, and continues in general session until it adjourns sine die. The *52 General Assembly has recognized this to be so in adopting its Rule 1:8:
"Each regular session of the General Assembly shall continue until terminated by adjournment sine die with the consent of the Senate, or until the next regular session shall convene."
The substance of these constitutional provisions, when read together, gives force to a logical conclusion that the framers of our Constitution of 1947 intended that:
(1) at all times, under normal or emergency circumstances, the people of the State should have a Legislature available to act; and
(2) the power to call, convene or assemble the Legislature is vested in the Governor and not the Legislature.
Applicants urge that the executive power to convene the Legislature does not embrace the power to convene or call or assemble the General Assembly alone, and that under the doctrine of expressio unius est exclusio alterius a stated power to convene the Senate alone negatives any implied power to convene separately the Assembly.
The merits of such contentions might well be controlling if the Legislature had been in adjournment sine die and we were limited, in our consideration, to a special session as provided in Art. IV, Sec. I, par. 4, of the Constitution. But such is not the case, as the Legislature was in regular session and could be convened at any time by the Governor. Art. V, Sec. I, par. 12. Emergency legislation was pending in the Legislature and had been acted upon by the Senate. To say that the General Assembly, a coordinate part of the Legislature, could not, under such circumstances, be convened to act on such legislation would indeed be a strict, narrow and technical interpretation contrary to the spirit and intendment of the Constitution and its pronounced objectives. As Professor Cooley has so aptly stated:
"* * * Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which *53 every man, learned and unlearned, may be able to trace the leading principles of government." 1 Cooley, Constitutional Limitations (8th ed. 1927), p. 131, c. IV, "Construction of State Constitutions."
Power to convene the Legislature must, of necessity, imply the right to assemble for a legislative purpose, and would inferentially include all incidental and essential powers to carry out and put into effect the declared policies of the Constitution. If, while the Legislature was in general session, the Governor had the power to bring back from an interim adjournment both houses of the Legislature to receive an emergency recommendation, it would follow that if one branch had already acted thereon, this power should imply the right to convene into session the remaining branch in order to effectuate a legislative purpose. A greater power may include a lesser power when the lesser power is of the same character with the greater and is essential to its execution. See 72 C.J.S. Powers § 23, p. 414; National State Bank of Newark v. Morrison, 9 N.J. Super. 552, 560 (Ch. Div. 1950). The principle that "the lesser is included in the greater," followed in civil proceedings involving the interpretation of contractual instruments, may, nonetheless, be invoked in the construction of a constitutional provision if it be necessary to give effectiveness to such a provision.
The maxim expressio unius est exclusio alterius should not be taken too literally or be applied arbitrarily. It is not an absolute rule but merely an aid in determining intent. Kobylarz v. Mercer, 130 N.J.L. 44, 48 (E. & A. 1942); Branson v. Branson, 190 Okl. 347, 352, 123 P.2d 643, 648 (Sup. Ct. 1942). In the case of State ex rel. Todd v. Yelle, 7 Wash.2d 443, 454-455, 110 P.2d 162, 168 (Sup. Ct. 1941), this aphorism was held not to apply to a constitutional provision.
Our attention has been directed to Royster v. Brock, 258 Ky. 146, 79 S.W.2d 707 (Ct. App. 1935). This case is distinguishable in that the objection was not to the Governor's convening the General Assembly, but rather the *54 right of the Governor to revoke or prorogue the session after the Assembly had convened. Compare In re Opinion of the Justices, 136 Me. 531, 12 A.2d 418, 420 (Sup. Jud. Ct. 1940), where the Governor, by constitution, was authorized to convene the legislature on extraordinary occasions, which he did. A question was raised as to his power to revoke the call before the session date scheduled. It was held that he had such power, the court saying:
"Although there is no express constitutional provision authorizing the revocation of such call, yet such power is necessarily inferable from that clearly granted."
The necessity of augmenting the powers of the Executive Department was a subject of considerable concern to the delegates at the Constitutional Convention in 1947 and, as pointed out by our Supreme Court in Russo v. The Governor of State of New Jersey, 22 N.J. 156, 166 (1956), it took more than a century to develop and recognize the need "to bring the powers of the governor into line with the popular impression of the powers of that office and to provide a centralization of authority and power in the office of governor under reasonable checks and balances, so that the chief executive may be truly responsible to the people for the conduct of the executive branch of government." Report of the Committee on Executive, Militia and Civil Officers, 2 Proceedings of the Constitutional Convention of 1947, 1122.
The power of the Executive and leadership cannot be separated. Black, The Relation of the Executive Power to Legislation, p. 21 (1919). The Governor's responsibilities and powers have been vastly enlarged to meet the demands of modern government, and where the constitutional intent and objectives are clear, the judiciary should not withhold the recognition of implied powers that are necessarily incident to the powers expressly stated. This would not be inimical to the doctrine of the separation of powers or the system of checks and balances which have been so thoroughly *55 imbedded in our form of democratic government. Montesquieu, the father of the doctrine, never envisioned a complete separation of powers. He recognized the overlapping of powers and the necessity of coordination. See Vanderbilt, The Doctrine of the Separation of Powers, p. 50 (1953):
"The doctrine of the separation of governmental powers is not a mere theoretical, philosophical concept. It is a practical, workaday principle. The division of government into three branches does not imply, as its critics would have us think, three watertight compartments. Montesquieu, as we have seen, knew better; the three departments, he said, must move `in concert.'"
A much-quoted classic statement is that by Mr. Justice Holmes in his dissenting opinion in Springer v. Government of Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928):
"* * * It does not seem to need argument to show that however we may disguise it by veiling words we do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so, which I am far from believing that it is, or that the Constitution requires."
The action of the Governor in convening the General Assembly on February 1, 1961, under the circumstances recited, was within the executive power fairly and reasonably contemplated by the pertinent provisions of our Constitution of 1947.

II.
The word "convene" has been interpreted to mean "to call together, cause to assemble, or convoke," 18 C.J.S. Convene p. 37 (1939), cf. Webster's New International Dictionary (2d ed. 1960, unabridged). The authority of a Governor to convene the Legislature or either branch thereof, expressed or implied, would extend to issuing a call to the legislators addressed to come together, to meet, to assemble for official business. Neither the General Assembly *56 nor any of its officials attempted to "convene" the General Assembly on February 1, 1961. The members of that legislative organ responded 100% to the Governor's call; all but one by personal appearance, and that one absentee answered by telegram explaining his inability to attend because of prior commitments.
The form of notice that the Governor sent to each Assemblyman made it quite clear that the purpose of convening on February 1, 1961 was "to act on reapportionment." Moreover, it was stipulated that this meeting called by the Governor to act on reapportionment was "widely reported in the press in New Jersey prior to and on February 1, 1961." Notice of intention to enact legislation is not a prerequisite to convening the Legislature, which is the representative body that makes the laws of the people. It is the law-making power. Hawke v. Smith, 253 U.S. 221, 40 S.Ct. 495, 497, 64 L.Ed. 871 (1920); 52 C.J.S. Legislature p. 1049. The purpose of the meeting was, however, adequately stated in the Governor's telegrams.
The numerous authorities cited in support of the notice requirements incident to conducting the affairs of corporations and municipal bodies would not be applicable in the case under review. Such incorporated entities operate within the orbit of the statutes under which they are created, and any notice requirements to which they might be subject cannot be said to apply to their creator, the Legislature, or to the Executive Department, a coordinate and constitutional branch of our State Government.
The sufficiency of the notice as to form and time is a matter of discretion with the Governor and was certainly effective in that all of the members of the General Assembly responded. In a Pennsylvania case, In re City of Pittsburgh, 217 Pa. 227, 66 A. 348 (Sup. Ct. 1907), affirmed Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), the general assembly was convened by the governor in extraordinary session to consider certain designated subjects. The governor subsequently issued another proclamation *57 substituting additional subjects to be considered at this session. The court said:
"Whether the general assembly ought to be called together in extraordinary session is always a matter of the executive alone. How it shall be called, and what notice of the call is to be given, are also for him alone. The constitution is silent as to these matters, and wisely so, for emergencies may arise, such as riots, insurrections, widespread epidemics, or general calamities of any kind, requiring the instant convening of the legislature, and, in the power given to the governor to call it, no time for the notice is too short if it can reach the members of the general assembly."
When the Assemblymen so came together on February 1, 1961, they were in session and subject to the Assembly rules. They have the right to determine their own rules of procedure, and this is a matter of constitutional provision, Constitution of 1947, Art. IV, Sec. IV, par. 3. The official rules of the General Assembly, Rule 9:1, provides that "A quorum to do business shall consist of a majority of all its members."
After opening the session, the usual procedure followed  prayer, roll call, declaration of quorum present and pledge of allegiance to the flag. The first order of business was to rescind the resolution of adjournment that had been adopted on Monday, January 30, 1961, and to constitute the General Assembly as resuming its regular session on Wednesday, February 1, 1961. Previous notice of intention to rescind a resolution is not necessarily required. Any standing rule of the General Assembly is subject to being rescinded, changed or suspended by a vote of the majority of the whole number of members (Rule 21:2). See Cushing's Manual of Parliamentary Practice, p. 38 (1925), where, after discussing "sessions" and the adoption of a rule or resolution of a permanent nature, there is a statement:
"And furthermore, it can be rescinded by a majority vote, providing that notice to that effect had been previously given; or it can be rescinded without notice by a majority of the whole membership, or by a two-third vote." (Emphasis supplied)
*58 Finally, we should not lose sight of the fact that, unlike the Constitution of the United States, our State Constitution is not one of grants or delegation of powers but is regarded as one of limitation or restriction of powers. The State Legislature represents the sovereign people and its powers are residual. "What the people have not said in the organic law their representatives shall not do, they may do." 49 Am. Jur., States, Territories, and Dependencies, § 36, p. 254 (1943); 16 C.J.S. Constitutional Law § 70, p. 189 (1956); State v. Murzda, 116 N.J.L. 219, 222 (E. & A. 1935). The authorities holding that the Legislature does not have the power to convene itself are based upon the theory that such power constitutionally rests upon the Executive. It would naturally follow that if the Constitution did not vest such power in the Governor, a limitation upon the Legislature, then such power would of necessity rest with the Legislature. In any event in the matter sub judice, we have the Governor exercising such power and we also have the General Assembly acknowledging and responding to the Governor's call and formally convening in session.

III.
Specifically, applicants contend that any "loose past practice" of the General Assembly respecting matters of "adjournment and convening" does not create an estoppel or waiver of its obligation to comply with the law and its own formal rules.
Our Supreme Court has declared that the doctrine of estoppel is not given the same freedom of application against the public as against private persons. Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 503 (1955); Annotation, 1 A.L.R.2d, 338 (1948); 19 Am. Jur., Estoppel, §§ 165, 166 (1939). Failure to perform a duty cannot cancel a legislative obligation. This was made clear in the apportionment case of Botti v. McGovern, *59 supra (97 N.J.L., at page 356), when it was held that the right to reapportionment could not be defeated by non-action of the Legislature, quoting with approval Peckham, J., in the New York apportionment case of People ex rel. Carter v. Rice, 135 N.Y. 473, 31 N.E. 921, 16 L.R.A. 836 (Ct. App. 1892), "It cannot be tolerated that a Legislature, by mere omission to perform its constitutional duty at a particular session, could thereby prevent for another ten years the apportionment provided for by the constitution."
It is not the function of this court to substitute its judgment for that of the General Assembly with respect to the rules which it has adopted or the procedure followed in giving effect to the rules. Our inquiry is confined to the single constitutional question  was chapter 1, Laws of 1961 duly passed by both houses of the Legislature and made effective as law in the manner required by the Constitution?
The General Assembly is empowered under our Constitution to "determine the rules of its proceedings" (Art. IV, Sec. IV, par. 3), which rules ordinarily would not be subject to review by the judiciary unless there is an obvious violation of fundamental rights; otherwise the legislative rules are authoritative and beyond challenge. In State v. Rogers, 56 N.J.L. 480, 631 (Sup. Ct. 1894), a dispute arose in connection with the reorganization of the Senate, and our then Supreme Court held that "the majority of senators are the absolute masters of the occasion." (Emphasis supplied.) See also In re Ross, 86 N.J.L. 387, 391 (Sup. Ct. 1914), where it was held that a presumption was in favor of the constitutionality of the law questioned in those proceedings, and the court recognized that the Assembly had power to suspend its own rules although no evidence had been submitted that this course had been followed. After declaring that "The presumption is in favor of orderly procedure by that body," Chief Justice Gummere, speaking for the court, went further to say: "Moreover, if it had been shown that there had been no suspension of the rule in this case, we would hardly be *60 justified in assuming that the House of Assembly had violated the constitutional mandate * * *."

IV.
If there is any permissible construction in favor of constitutionality, the action of the Legislature should be upheld. In re Petition of Attorney-General, 98 N.J.L. 586, 590 (Sup. Ct. 1923), involved proceedings in which it was contended that the House of Assembly passed an act over the Governor's veto on the same day as it was received, and in doing so violated Art. V, Sec. 7, of the then prevailing Constitution. That section provided "every bill which shall have passed both Houses shall be presented to the governor; if he approve he shall sign it; but if not he shall return it, with his objections, to the house in which it shall have originated * * * but, in neither House shall the vote be taken on the same day on which the bill shall be returned to it." Said the court, "* * * it must conclusively appear that the provision is not susceptible of any other construction; or, at least, of a construction which would justify the action of the House of Assembly. For, if such other construction be permissible, then it cannot be said that it is manifest that the constitutional provision has been infringed upon, and that the statute is, therefore, a nullity; for no court will declare an act of the Legislature to be void if its unconstitutionality is in anywise doubtful."
Another case that similarly involved proceedings under N.J.S.A. 1:7-4 is In re An Act Concerning Alcoholic Beverages, 130 N.J.L. 123, 125 (Sup. Ct. 1943). The petitioners charged that the acting Governor (President of the Senate) exceeded his constitutional powers when he approved chapter 264, Laws of 1942 ("An act concerning alcoholic beverages, and supplementing Chapter one of Title 33, of the Revised Statutes"). The Governor had reentered the State and talked, over the telephone, with the *61 acting Governor "within a half hour, three-quarters of an hour previous to the signing of the bill." It was contended that the presence of the Governor in the State ipso facto constituted a "return" by the Governor within the meaning of the Constitution, and that the statute in question lacked constitutional validity because it was not signed by the Governor. The court, in answering this objection, used this language:
"We think that petitioners' contentions are not sound. They are based, in our opinion, upon a too narrow and strict, if not an altogether erroneous, interpretation of the provisions of Art. V, par. 13, of the constitution.
There is no need to restate the established principles of law controlling the interpretation of a constitutional provision. They are fully stated in State v. Murzda (Court of Errors and Appeals), 116 N.J.L. 219, 222, 223, 183 A. 305. It shall suffice if we but observe that ours is the function to ascertain the `true sense and meaning' of the words used in light of the provision in which they appear, and in light of the correlated provisions, if any, and in light of the instrument as a whole. More tersely stated, our objective is to ascertain the `thought' which the constitution expresses." (130 N.J.L., at p. 128.)
General principles of construction are not confined to the substantive provisions of a statute. In re Freygang, 46 N.J. Super. 14, 28 (App. Div. 1957), affirmed per curiam 25 N.J. 357 (1957). Our courts have repeatedly declared that a statute is presumably constitutional and should be so construed if it is reasonably susceptible to such a construction. Daly v. Daly, 21 N.J. 599, 604 (1956); Woodhouse v. Woodhouse, 17 N.J. 409, 416 (1955). It will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for doubt. National City Bank of New York v. Del Sordo, 16 N.J. 530, 542 (1954); In re Freygang, supra. The purpose of judicial interpretation is the discovery of "the true sense of the form of words which are used * * *, taking all its parts into consideration, and, if fairly possible, giving them all effect." State v. Murzda, supra (116 N.J.L., at page 222); Inhabitants of Orvil Tp. v. Borough of Woodcliff, *62 64 N.J.L. 286, 289 (E. & A. 1899). Even if an act is void according to what is deemed to be the correct view, its constitutionality should be sustained when there is another view that would support it. Attorney-General v. McGuinnes, 78 N.J.L. 346, 373 (E. & A. 1909). In Botti v. McGovern, supra (97 N.J.L. 353, 357), the court referred to Mr. Justice Strong, writing for the United States Supreme Court in the Legal Tender Cases, 79 U.S. 457, 531, 12 Wall 457, 20 L.Ed. 287 (1870), and quoted:
"When investigating the nature and extent of the powers conferred by the constitution, it is indispensable to keep in view the objects for which those powers were granted. This is a universal rule of construction, applied alike to statutes, wills, contracts and constitutions. If the general purpose of the instrument is ascertained, the language of its provisions must be construed with a reference to that purpose, and so as to subserve it."
The true rule of construction recognized by our Supreme Court in Behnke v. New Jersey Highway Authority, 13 N.J. 14 (1953), and as stated in the court's opinion at page 26, "is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth," citing Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 797, 45 L.Ed. 1088, 1116 (1901).

CONCLUSION.
In summary, the basic and controlling facts in the case now before the court are: the Governor called back the General Assembly, from a temporary adjournment during a regular session, to convene on February 1, 1961 in order to consider emergency reapportionment legislation which had been duly passed in the Senate (Senate Bill No. 65) on January 30, 1961; notice was given to all members of the *63 Assembly and the purpose of the meeting was stated therein; the members of the General Assembly did in fact assemble on that day and proceeded in regular session; an emergency resolution was adopted by a vote of 45 to 1 and then Senate Bill No. 65 was considered and passed by a vote of 44 to 10; whereupon it was approved by the Governor and filed with the Secretary of State. When we consider our Constitution of 1947 in its entirety and apply the rules of construction, which have been firmly settled by our judicial decisions, to all the facts, we are led to the conclusion that Senate Bill No. 65 was duly passed by both houses of the Legislature and was approved by the Governor in the manner required by the Constitution. To hold otherwise would lend unwarranted dignity to technical construction and alleged procedural irregularities which would contravene the true interpretation, intent, meaning and spirit of the Constitution.
For the reasons stated herein, the application of the petitioners is dismissed and their motion for judgment is denied; and the cross-motion of the Attorney General to dismiss the petition and his motion for summary judgment of dismissal are granted.