774 A.2d 576

IN RE APPLICATION OF GLEN GILMORE AND MICHAEL DUPONT TO CONTEST THE VALIDITY OF THE ENACTMENT OF SENATE BILL 2328 (P.L.2001, C. 73).

Superior Court of New Jersey
Appellate Division

Decided May 8, 2001.

304

Before Judges BAIME, WALLACE, Jr., and CARCHMAN.

*Angelo J. Genova* argued the cause for appellants (*Genova, Burns & Vernoia,* attorneys; *Mr. Genova,* of counsel; *Kathleen Barnett Einhorn* and *Celia S. Bosco,* on the brief).

*Mark J. Fleming,* Assistant Attorney General, argued the cause for respondent State of New Jersey (*John J. Farmer, Jr.,* Attorney General, attorney; *Mr. Fleming,* of counsel and on the brief; *John P. Bender,* Assistant Attorney General, on the brief).

*Carmen Saginario, Jr.* argued the cause for respondent-intervenor New Jersey State Senate (*Capehart & Scatchard,* attorneys; *Mr. Saginario,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Applicants Glen Gilmore and Michael Dupont brought these proceedings to invalidate *L.* 2001, *c.* 73 (Chapter 73) because

of procedural irregularities that are alleged to have occurred in the Senate on the date the bill was introduced. Chapter 73 changed the primary election date for 2001 from June 5 to June 26, increased public financing grants and expenditure limits for gubernatorial candidates, and altered various deadlines for statutorily mandated pre-primary and post-primary activities. Applicants' petition to invalidate the enactment was filed pursuant to *N.J.S.A.* 1:7–4. That statute confers original jurisdiction upon the Appellate Division to consider challenges to the validity of laws and joint resolutions adopted by the Legislature. *Ibid.; see also N.J.S.A.* 1:7–1. The jurisdiction granted is limited to deciding attacks upon the "machinery of enactment." *In re Application of McCabe*, 81 *N.J.* 462, 465, 409 *A.2d* 1158 (1980). We are not empowered to consider the substantive constitutional validity of the laws themselves. *Ibid.*

The question raised by applicants is whether a quorum of Senators was present prior to the introduction and first two readings of Chapter 27. At issue is whether a full complement of twenty-one Senators must be physically present in the Senate chamber before a quorum can be registered. An ancillary issue is whether a quorum of Senators must be physically present when a bill is introduced and receives its first two readings.

These questions can best be understood within the context of the work-a-day activities of the Senate. The informal custom is for each Senator to press the "yea" button on his or her desk indicating the Senator's attendance in the Senate. As a matter of common practice, Senators are not required to remain on the Senate floor once their attendance is marked and noted. Applicants contend, however, that all twenty-one Senators must be physically present in the Senate chamber before a quorum can be registered or business conducted. They argue that a quorum was not obtained prior to the introduction and first two readings of Chapter 27, and that the legislation is thus invalid.

We hold that the mechanics of identifying a quorum is a matter committed to the Legislature. In the absence of specific constitu-

tional or statutory standards, we have no roving commission to determine the manner in which the Legislature is to fulfill its constitutional mission. We abstain from deciding what we perceive to be a nonjusticiable political question.

## I.

We need not recount the facts at length. On April 18, 2001, Senate President Donald DiFrancesco notified members of the Senate that there would be a quorum call on April 20, 2001. At 10:00 a.m. on the scheduled date, the Senate Secretary's desk was opened, and Senators began to filter into the Senate chamber. Pursuant to the informal custom we have described, each Senator marked his presence or her presence in the Senate chamber by pressing the "yea" button on his or her desk. It is apparent from the documentary submissions filed by applicants that not all of the Senators remained in the Senate chamber after noting their presence. According to affidavits accompanying applicants' petition, at various times during the day, members of the Senate Minority Office appeared in the Senate chamber and found no more than ten Senators present.

According to the Senate Journal, a quorum was registered at 2:52 p.m., signifying that at least twenty-one Senators had indicated their presence by pressing the "yea" button on their desks. No Senator challenged the existence of a quorum. Chapter 27 was introduced and received its first two readings later in the afternoon. In their affidavits, members of the Senate Minority Office represent that they appeared in the Senate chamber at various intervals during the afternoon and found no Senators present. The proceedings were adjourned at 5:00 p.m.

The Senate next met on Monday, April 23, 2001. No Senator requested that the minutes of the April 20 meeting be read or amended to reflect a challenge to the quorum. The reading of the minutes for the April 20 meeting was waived. Ultimately, the minutes were adopted without amendment. Chapter 27 was given its third reading at the April 23 meeting. Following vigorous

debate, the Senate passed the bill by a vote of twenty-one to eleven. The Assembly passed the bill by a vote of forty-three to thirty. The bill was signed into law by the Acting Governor later that afternoon.

Applicants' petition was filed in the late evening hours of Friday, May 4, 2001. Because the statutory deadline for certification of candidates by the Secretary of State was looming, we accelerated the proceedings. We now grant the Attorney General's motion to dismiss.

## II.

The issue presented must be considered against the backdrop of the New Jersey Constitution. Three provisions are implicated. They provide: (1) "a majority of all [the Senate's] members shall constitute a quorum to do business," *N.J. Const.*, art. IV, § 4, ¶ 2 (1948), (2) "[a]ll bills and joint resolutions shall be read three times in each house before final passage," and "[n]o bill or joint resolution shall pass, unless there shall be a majority of all the members ... personally present and agreeing thereto," *N.J. Const.*, art. IV, § 4, ¶ 6, and (3) "[e]ach house shall ... determine the rules of its proceedings," *N.J. Const.*, art. IV, § 4, ¶ 3.

None of these provisions deals directly with the precise issue presented. However, the juxtaposition of several of these provisions suggests that the physical presence of twenty-one Senators is not required when a bill is introduced or when it is given its first two readings. Our inquiry thus starts with that question. We then proceed to the issue of whether the physical presence of twenty-one Senators in the Senate chamber at the same time is necessary for registering or obtaining an initial quorum.

We note that the "personally present" requirement is enjoined only with reference to the "final passage" of a bill. While the Constitution clearly mandates physical presence for the vote to adopt a bill, this requirement is notably absent from the earlier sentence in the same paragraph requiring that "[a]ll bills and joint resolutions shall be read three times." *N.J. Const.*, art. IV, § 4,

¶ 6. Considering these provisions in context, we do not read the Constitution as requiring the physical presence of a quorum in the Senate chamber at the time of introduction or the first two readings of a bill. The Constitution requires no more than that a majority be physically present at the time of the vote and agree to the passage of a bill in order for the bill to become a law.

We perceive no warrant for importing the requirements of one portion of paragraph 6 into another and combining the two with the quorum provision in paragraph 2 to manufacture a new procedural requirement for enactment of a law. The framers clearly did not intend to so encumber the lawmaking process. We discern no jurisprudential basis for such constitutional tinkering. If the validity of every action of the Senate were subject to such an ironclad rule requiring the presence of twenty-one Senators at all stages of the legislative process, the minutes of that body would be littered with observations pertaining to the second-by-second movements of members as they enter and exit the chamber. Otherwise, virtually every action of the legislative body could be challenged at any of the many stages of the legislative process.

The framers imposed the physical presence requirement only with respect to the final stage in passing a bill. They left it to the good sense and sound judgment of each body to determine the need for further requirements in its own duly promulgated rules.

Our examination of the Senate's formal rules discloses no provision directly on point. Senate Rule 2.2 states that "[t]wenty-one or more Senators shall constitute a quorum." Senate Rule 28:1 defines "quorum" as the "presence of at least [twenty-one] Senators at a meeting of the Senate." Senate Rule 27:1 provides that *"Mason's Manual of Legislative Procedure* shall in all cases, when not in conflict with these Rules, be considered and held as standard authority." Although *Mason's Manual* states that "[w]hen a body has convened with a quorum present, it can continue to transact business as long as a quorum is present," *Mason's Manual,* § 504, it does not specifically provide that the physical presence of twenty-one Senators is necessary to conduct

routine business such as the first and second reading of a bill. *Mason's Manual* states that "[w]henever it is observed that a quorum is not present, any member may call for the house to be counted and if found deficient, business will be suspended." *Ibid.* But where, as here, no such action is taken, "it is presumed that the quorum continues to be present. . . ." *Ibid.* Moreover, *Mason's Manual* provides that "[w]hen an action has been completed, it is too late to raise a point of order that no quorum was present when the action was taken . . . ." *Id.* at § 505. We thus find no specific Senate rule mandating the physical presence of twenty-one Senators in the Senate chamber when a bill is introduced or when it is given its first and second reading. In any event, even assuming the existence of such a rule, the point was not raised during the meeting of the Senate on April 20, 2001, or for that matter during the meeting of April 23, 2001, and, under *Mason's Manual,* the point is no longer cognizable.

■ Having said this, no one disputes the necessity of obtaining a quorum before the Senate's business can take place. Applicants argue that a quorum requires the physical presence of twenty-one Senators in the Senate chamber at the same time. As we have observed, the Constitution is silent on the issue. Although Senate Rule 3.1 provides in pertinent part that "[w]hen a quorum is present, the President [of the Senate] may proceed with the business" of that body, the rule does not indicate the method for tallying the number of Senators present for the purpose of registering a quorum.

In the absence of constitutional or statutory standards, or even a formal Senate rule dealing with the precise question presented, we decline applicants' invitation to establish a requirement mandating the physical presence of twenty-one Senators in order to register a quorum or conduct routine legislative business. We regard the question presented as essentially political in nature and, hence, nonjusticiable.

■ "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr,* 369 *U.S.*

186, 210, 82 *S.Ct.* 691, 706, 7 *L.Ed.*2d 663, 682 (1962). While the doctrines of separation of powers and checks and balances do not require hermetically sealed, watertight compartments in the conduct of the State's business, their purpose is to "safeguard the 'essential integrity' of each branch of government." *Gilbert v. Gladden,* 87 *N.J.* 275, 281, 432 *A.*2d 1351 (1981) (quoting *Massett Building Co. v. Bennett,* 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950)). The distribution of powers among the three branches of government is fundamental to our organic law. *State v. Gregorio,* 186 *N.J.Super.* 138, 145, 451 *A.*2d 980 (Law Div.1982). It has been hailed as the great "contribution of Anglo–American lawyers to the prevention of absolutism . . . ." *Mulhearn v. Federal Shipbuilding and Dry Dock Co.,* 2 *N.J.* 356, 364, 66 *A.*2d 726 (1949). The doctrine "expresses a profound belief that the concentration of governmental power increases the potential for oppression, and that fragmentation . . . helps insure its temperate use." *General Assembly v. Byrne,* 90 *N.J.* 376, 381, 448 *A.*2d 438 (1982).

In the context of the question raised, we conclude that the procedural rules applicable to the conduct of the Senate's business have been textually committed to the legislative branch of government. *See Baker v. Carr,* 369 *U.S.* at 211, 82 *S.Ct.* at 706, 7 *L.Ed.*2d at 682; *De Vesa v. Dorsey,* 134 *N.J.* 420, 431, 634 *A.*2d 493 (1993) (Pollock, J., concurring); *Gilbert v. Gladden,* 87 *N.J.* at 282, 432 *A.*2d 1351. As we noted earlier, our Constitution expressly provides that "[e]ach house shall . . . determine the rules of its proceedings." *N.J. Const.,* art. IV, § 4, ¶ 3. We have thus refrained from delving into whether the procedural rules of a legislative body were adhered to in the enactment of a law when the Constitution has been followed. *In re Application of Lamb,* 67 *N.J.Super.* 39, 59, 169 *A.*2d 822 (App.Div.), *aff'd,* 34 *N.J.* 448, 170 *A.*2d 34 (1961); *see also De Vesa v. Dorsey,* 134 *N.J.* at 433, 634 *A.*2d 493; *Gilbert v. Gladden,* 87 *N.J.* at 282, 432 *A.*2d 1351. We apply that principle here. It is not our function to substitute our judgment for that of the Senate with respect to the rules it has adopted or the procedure followed in giving effect to the rules.

Unless there is "an obvious violation of fundamental rights," *In re Application of Lamb,* 67 *N.J.Super.* at 59, 169 *A.*2d 822, we owe no duty or obligation to intervene.

That the Senate has acted in accordance with an informal, unwritten custom in determining whether a quorum was obtained and in not requiring the physical presence of twenty-one Senators during the bill's introduction and first two readings should not alter the principle applied. The overarching consideration is that the custom itself represents a determination by the legislative branch on how best to fulfill its constitutional mission. That determination deserves our respect.

Nor is it our business whether a different rule might better advance the public interest, as applicants contend. The Constitution commits such judgments to the legislative branch. The more the Constitution is found to be intolerant of disagreement on arguable issues, the deadlier becomes the grip upon human genius. The price of such intolerance may be sterility. We are not empowered to act as a superlegislature, and second guess that branch's rules of procedure.

We thus dismiss applicants' petition with prejudice.